**UNITED STATES of America,**
**Libelant,**

v.

**NEW YORK CENTRAL RAILROAD CO.,**
**Boston and Albany Railroad Co., and**
**New York Central System, Respondents.**

**No. 63–72.**

United States District Court
D. Massachusetts.

Nov. 9, 1965.

W. Arthur Garrity, Jr., U. S. Atty., John Paul Sullivan, Asst. U. S. Atty., Boston, Mass., Thomas F. McGovern, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for plaintiff.

Richard J. Ferriter, Boston, Mass., for defendants.

FRANCIS J. W. FORD, District Judge.

In this action the United States seeks to recover from defendant railroads [1] the cost of removal by the United States of an alleged obstruction to the navigable waters of the Chelsea River.

Under authorization of the Secretary of War given on March 8, 1917 defendants constructed, maintained and operated a drawbridge across the Chelsea River, a navigable waterway lying between Chelsea and East Boston. This river was in active use by vessels, particularly for the passage of tankers carrying petroleum products to storage facilities located on the banks of the river.

The bridge as constructed in accordance with the 1917 authorization afforded a channel for passage of vessels with a horizontal clearance of 70 feet. Around 1945 the oil companies and other shipping interests began to complain that a wider channel was needed to accommodate the larger tankers which were being used for the transportation of oil. There were also complaints that the bridge was constructed so as to have a maximum opening angle of 83 degrees, and in actual operation was opened only to an angle of 76 degrees. As a result empty tankers had to take on ballast and move on low water so as to clear the upraised span of the bridge.

After hearing on these complaints the Corps of Engineers on April 25, 1949 notified the Boston and Albany Railroad that the draw should be widened to provide a horizontal clearance of 150 feet. This notice appears to have been in the form of a recommendation rather than

---

1. Three defendants are named herein, The New York Central Railroad Co., the Boston and Albany R. R. Co. and the New York Central System. Beginning in July 1, 1900 the railroad properties of the Boston and Albany were leased to the New York Central and operated by the latter as lessee until April 3, 1961 when the Boston and Albany was merged into the New York Central. The New York Central System is the name under which the properties of the two railroads were operated as a unified system.

510

an order. The recommendation was never accepted by the railroads, although steps were taken toward action for rebuilding the bridge under the provisions of the Truman-Hobbs Act, 33 U.S.C.A. §§ 511–524, under which the government would have paid part of the cost of the work.

Before any final action under this act, the bridge collapsed on February 28, 1955. An undetected crack in the southwest channel of the vertical tower imposed strain on the remaining metal, causing the counterweight to fall and damaging the span of the bridge. The wreckage from this accident was removed at the expense of the railroad so as to clear the existing 70 foot channel.

However, there remained portions of the bridge structure including piers, trestles and fenders which still limited the use of the river to the 70 foot channel. Moreover, there were complaints that the fenders were in a deteriorated condition which caused additional danger of injury to tankers which might scrape against them.

The railroads made arrangements to move their traffic over the lines of another railroad and on October 17, 1956 on petition of the railroads the Interstate Commerce Commission issued a certificate permitting abandonment of the bridge by the Boston and Albany and abandonment of operation of the bridge by the New York Central.

On May 19, 1959 the Corps of Engineers denied the railroads' request that removal of the bridge structure be made under the Truman-Hobbs Act [2] and ordered the railroad to remove certain portions of the hulk of the bridge with accompanying piers, trestles and fenders, which were deemed to obstruct navigation unreasonably. The railroad did not comply with this order but requested a hearing on the matter under the Truman-Hobbs Act. This request was denied.

On April 1, 1960, however, the Corps of Engineers held a public hearing on the question of the removal of the remnants of the bridge. Thereafter on April 28, 1960 the Secretary of the Army ordered the railroads to remove certain portions of the bridge, said work of removal to be commenced within 30 days. The railroads did nothing to comply with this order. On June 17, 1960 the Corps of Engineers notified the Boston and Albany that the bridge remains would be removed by the United States, with reservation of all rights of the United States to recover from the railroads the expense of removal. Thereafter the bridge was removed by a contractor under contract with the United States at a cost to the United States of $214,746.40 and the United States in this action seeks to recover this expense from the railroads.

The uncontradicted evidence by four experts presented by plaintiff proved that the remains of the bridge removed by the United States constituted an unreasonable obstruction to navigation of the Chelsea River. The 70 foot existing channel in the river provided a barely adequate passage to the 68 foot tankers in use in the oil industry. The fenders along the abutments of the bridge had been allowed to deteriorate, leaving exposed bolts which could be avoided with difficulty, and the danger of sparks setting fire to a tanker which scraped these bolts created a serious fire hazard for tankers using the river. Moreover, the increasing use of larger tankers in the industry made the 70 foot channel inadequate to serve the needs of navigation and prevented adequate use of the full available navigable width of the rivers.

The difficulty in this case arises from the fact that there is no statutory provision explicitly authorizing the United States to remove an obstruction to navigation and then recover the expense of removal from the parties respon-

2. The basis of this denial was that once the bridge had collapsed and had been formally abandoned, it was no longer a bridge "which is used and operated for the purpose of carrying railroad traffic". 33 U.S.C.A. § 511.

sible. The railroads contend that the only remedy available to the United States in the present situation was a criminal prosecution of the railroads for failure to comply with an order of the Secretary of the Army directing removal or alteration of the bridge. 33 U.S.C.A. §§ 495, 502. The statute can no longer be so narrowly interpreted. In United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, the Supreme Court gave a broad interpretation to § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C.A. § 403, holding that obstruction to navigation was not limited to the structures specifically enumerated therein but included diminution of the navigable capacity of a waterway by other means. It further upheld the granting of an injunction enjoining respondents from depositing industrial solids in the Calumet River and ordering them to remove existing deposits to restore the depth of the channel to 21 feet, on the ground that while the Act did not specifically authorize the bringing of a suit for an injunction in such a case, Congress had in § 403 defined the purpose and interest of the United States in maintaining the navigable capacity of waterways and the courts could fashion appropriate remedies to fit contingencies not specifically provided for.

In United States v. Perma Paving Co., Inc., 2 Cir., 332 F.2d 754, the defendant had placed fill on property on the bank of the Bronx River, which caused a mud wave which produced shoaling in the river which interfered with navigation. In reliance on the *Republic Steel* case, supra, it was held that where the United States had dredged the river it was entitled to recover its expense from those responsible for causing the obstruction.

■ The railroads further argue that in any event they cannot be held to have created any unreasonable obstruction to navigation because the bridge was erected under a properly issued permit of the Secretary of War and in accordance with the terms of that permit. It is, however, well established that a bridge erected under and in accordance with a properly issued permit can in the course of time become an unreasonable obstruction because of the changing nature of the traffic seeking to use the waterway, even when such bridge is still serving the traffic on land for which it was built, and the owner of the bridge can be required to alter or replace it so as to remove the interference with water-borne traffic. Monongahela Bridge Co. v. United States, 216 U.S. 177, 189, 193–194, 30 S. Ct. 356, 54 L.Ed. 435; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523. A fortiori, the fact that a bridge was originally properly licensed does not mean that after it has been formally abandoned, the railroad has no liability for the remains of the bridge when they constitute a danger and obstruction to navigation. Corby v. Ramsdell, 2 Cir., 48 F.2d 701.

■ Any structure which limits the use of a waterway as a navigable stream is an obstruction to the possible use of the waterway for navigation. Certain obstructions are under certain circumstances reasonable—such as duly authorized bridges which serve the interests of land transportation. Permission to erect such a bridge, however, does not give an indefinite right to maintain it under changed conditions, and the United States may revoke this privilege when under changing circumstances the bridge has become an unreasonable obstruction to navigation. Granting that the bridge involved here was a reasonable and proper obstruction when it was built, it was nevertheless an obstruction created by the railroad. When the bridge became unusable and was abandoned, it became an unreasonable obstruction, for whose existence the railroad was responsible.

Further justification for holding the railroad responsible can be found in the circumstances of the bridge's destruction. The railroad's own report as to how the accident happened shows that a crack in the southwest channel of the tower had existed for some time so that just prior to the accident only about four square inches in area of the channel remained intact. This remaining area

cracked under the pressure of opening the bridge, causing the collapse of the channel and the fall of the counterweight. The cracked area previous to the accident had been covered with paint so that the crack could not be detected by casual observation. The only inspection of the bridge by the railroad was in July, 1954 and was limited, so far as this channel was concerned, to visual inspection from a distance. The court finds this defective condition could have been discovered by the exercise of reasonable care. It constituted negligence not to do so.

The specifications for the steel used in the bridge called for a yield point of 33,-000 p. s. i. There was evidence that some of the steel in the tower failed to meet these specifications. Tests of the steel in the southeast channel (which did not crack initially) showed a yield point of only 30,970 p. s. i. However, regardless of whether the channel which failed was below the specific standard when it was originally installed, the railroad's report showed that the channel which collapsed was subject to stress during the operation of opening the bridge which varied from 25,000 p. s. i. to possibly as much as 43,000 p. s. i.

■ Thus the railroad was at fault, negligent in operating a bridge which produced stresses on the channels of the tower in excess of the stresses they were designed to bear, and in failing to conduct adequate investigation to detect cracking of the steel under these excessive stresses. This fault on the part of the railroad resulted in the collapse of the bridge, and hence the railroad should be held responsible for the obstruction of navigation by the remains of the collapsed bridge.

■ The Boston and Albany contends that it never received notice of the April 1, 1960 hearing. The government could not show delivery of a notice of this hearing to Boston and Albany. New York Central did receive notice. Boston and Albany, as lessor railroad, at that time maintained a small office with three employees. Any legal notices involving property leased to New York Central were forwarded to New York Central. Boston and Albany had actual notice of the hearing, its counsel appeared and took part in the proceedings without at that time raising any objection to lack of notice.

Boston and Albany contends that in other respects the April 1, 1960 hearing failed to conform to the requirements of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., particularly in that the government failed to designate the statutory authority under which it was proceeding and that the hearing was conducted by a person not designated as a hearing officer in accordance with the Act. Hence, it argues the order to remove the remains of the bridge was invalid and the United States cannot recover on the basis of any failure of the railroad to comply with the order.

■ The railroad appears to misconceive the nature of the present action. The United States does not base its case on the fact that the railroad is liable solely because it failed to obey the order of the Secretary of the Army. This is not a criminal proceeding under 33 U.S.C.A. § 502. Neither is it specifically an action to recover any civil penalty in lieu of the fine imposed by this section. It is not an action expressly spelled out in the statute, but one which under the *Republic Steel* and *Perma Paving* cases, supra, is impliedly authorized by the Act, by which the United States, having removed an unreasonable obstruction from a navigable waterway, seeks reimbursement of the costs of removal from those responsible for its creation. Moreover, the United States does not rely on the results of the hearing or the findings of the Secretary of the Army or the Corps of Engineers to establish the fact that the remains of the bridge constituted an unreasonable obstruction to navigation. This question was tried de novo by the court in the present action with full opportunity to both parties to present their evidence thereon. The matter considered in the April 1, 1960 hearing was thus

one subject to subsequent trial of the law and the facts de novo in this court and therefore conformity to all the requirements of the Administrative Procedure Act was not required. 5 U.S.C.A. § 1004(1). The only significance to be given here to the hearing or to the orders issued subsequent thereto is that these established that the railroads were given adequate notice and opportunity to remove the obstruction before the government proceeded to do so.

■ The government claims reimbursement for its costs of removing the remains of the bridge in a total amount of $214,626.40, consisting of $176,902 paid under its contract to Perini Corporation, $7,887.29 for the Corps of Engineers' plans and designs, and $29,837.-11 for inspection, supervision and administrative expense. Defendants object to certain of these items, contending they were not a necessary part of the work of removing the navigational obstruction. The evidence consisted of conflicting testimony of engineers produced by both sides. The court finds that these disputed items under good engineering practice were reasonably necessary. The removal of the rest pier, and not just of the dilapidated fenders, was necessary to provide a reasonably safe passage for tankers through the channel and provable damage. The dredging of the channel and the filling of the holes left by removal of the piers were needed to restore the channel to its proper depth. The filling of these holes was also necessary to provide proper support for the adjacent highway bridge. The provision of sheet piling to be driven around the piers of the highway bridge was a reasonably necessary precaution to prevent damage to this bridge from blasting involved in the demolition of the remains of the railroad bridge. The charges for plan preparation, inspection and administrative costs were for reasonably necessary expenses in connection with the demolition operation.

Judgment will be entered for the United States in accordance herewith.