CENTRAL RIVERS TOWING, INC.,
Plaintiff-Appellee,

v.

CITY OF BEARDSTOWN, ILLINOIS,
Defendant-Third Party
Plaintiff-Appellant,

v.

UNITED STATES of America, Third
Party Defendant-Appellee.

CENTRAL RIVERS TOWING, INC.,
Plaintiff-Appellee,

v.

CITY OF BEARDSTOWN, ILLINOIS,
Defendant-Third Party
Plaintiff-Appellee,

v.

UNITED STATES of America, Third
Party Defendant-Appellant.

CENTRAL RIVERS TOWING, INC.,
Plaintiff-Appellant,

v.

CITY OF BEARDSTOWN, ILLINOIS,
Defendant-Third Party
Plaintiff-Appellee,

v.

UNITED STATES of America, Third
Party Defendant-Appellee.

Nos. 83-2909, 83-2945 and 83-2960.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1984.

Decided Dec. 6, 1984.

As Amended Jan. 8, 1985.

John S. Sandberg, St. Louis, Mo., for plaintiff-appellee.

John W. Leskera, East St. Louis, Ill., for defendant-third party plaintiff-appellant.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

This admiralty suit arises out of damage sustained by the towboat Keystone, owned and operated by the plaintiff Central Rivers Towing, Inc. ("Central Rivers"), when it

struck a submerged bridge pier located in the navigable channel of the Illinois River. The submerged pier originally was part of a bridge that was owned by the defendant City of Beardstown (the "City"), but was demolished about 1955. Plaintiff brought suit against the City, claiming maritime negligence, as well as violations of statutes including the Rivers and Harbors Act, 33 U.S.C. § 403, involving the City's failure to mark or remove the submerged pier. Beardstown, in turn, filed a third-party complaint against the United States, claiming indemnity or contribution for any judgment won by the plaintiff. The theory of this third-party complaint was that the United States Coast Guard had failed to exercise due care in marking the location of the submerged pier.

The district court held that both the City and the United States were at fault, and that each was liable for fifty percent of the stipulated amount of the plaintiff's damages plus interest. The court required the City to pay interest on its half of the damages from the date of the accident at the rate of twelve percent. The court determined that the government should pay interest from the date the lawsuit was filed at 4% per annum.

On appeal, the City argues that it was entitled to judgment as a matter of law because it fully complied with the Government's specifications when it originally demolished the bridge, and alternatively because it legally abandoned the bridge piers. The City also challenges both the trial court's award of prejudgment interest against it and the court's determination that 12% was an appropriate rate. The United States contends that it cannot be liable to the City in contribution or indemnity, because a direct claim by the plaintiff against the United States would now be barred by the applicable statute of limitations. Hence the government could not be jointly liable with the City. The United States also argues that it was not negligent in maintaining a buoy used to mark the location of the submerged pier. Both the City and the United States claim that the trial court erred in finding that the plaintiff

was free from negligence. Finally, the plaintiff Central Rivers cross-appeals on the limited issue whether the trial court erred by limiting its recovery of prejudgment interest from the government to the four percent rate.

## I.

The relevant facts as found by the district court may be set out briefly. The City owned and operated the State Street Bridge until 1955, when it decided to demolish it. After correspondence between the City and the United States Army Corps of Engineers, the Corps issued specifications for the demolition which included certain minimum requirements of removal. The specifications allowed several of the bridge piers to remain, including Pier No. 1, which apparently was left in place at the City's request. The pier was to be left above the waterline, but at some point after the demolition the pier became submerged, and subsequently was involved in several accidents. Sometime after the pier remains sank from sight, the United States Coast Guard began marking the underwater obstruction with a buoy. On June 17, 1979, after stopping to purchase fresh water from the City, the Keystone struck the submerged remains of Pier No. 1. No buoy was marking the location of the pier at the time of the accident.

The district court found, based on expert testimony, that the pilot of the Keystone, Robert G. Barber, acted in a reasonable and prudent manner while operating the vessel on June 17th. The court also concluded that the submerged pier constituted a hazard to navigation, noting that prior to the accident at issue here, several other vessels had been grounded on or had struck the pier remains. In one case there was an accident despite the fact that the involved pilot traveled the area daily. The court found that the City made a "conscious decision to leave the obstruction in the waterway," which was "expedient from a cost viewpoint, but not from a safety viewpoint." Thus the court apparently

held the City liable because it had failed to remove the pier remains despite its knowledge that they posed a danger.

Finally, the district court reviewed the contradictory evidence concerning the Coast Guard's performance of its obligation to mark the pier remains. Captain Mark Elbrecht testified that the buoy had been missing since March of 1979, and that he had notified the Coast Guard that it was missing at least three times before the accident. Master Chief Donald Urquhart of the Coast Guard testified that the river was closed during March and April of 1979, and so the buoy was not replaced during this period. He asserted that he had inspected the area three or four times before the accident, however, and that he had observed the buoy in place. Finding "no reason to doubt" Captain Elbrecht's testimony, the district court held that the government had failed to use due care in marking the obstruction. *See* n. 2, *infra.*

## II.

■ With respect to the City's liability, the City's primary argument is that it is entitled to judgment as a matter of law under the rationale of *Southern Pacific Co. v. Olympian Dredging Co.,* 260 U.S. 205, 43 S.Ct. 26, 67 L.Ed. 213 (1922). There a railroad company demolished a bridge that it owned in compliance with specifications provided by the Secretary of War. The specifications included the condition that the railroad remove every portion of the bridge, including the bridge piers, which were to be removed from the bed of the river to a depth of seven feet below the lowest water level. The railroad did more than was necessary, cutting down the old piers to a level at or below the existing river bed. Subsequently the U.S. Government constructed a wing dam and carried on dredging operations very near the bridge, so that the bed of the river and surface of the water were gradually lowered. Twenty-three years later, the stumps of the old piers protruded several feet above the new river bed. A dredge sank after it struck one of these stumps, and its owner sued the railroad for its damages.

In exculpating the railroad from the sinking, the Supreme Court emphasized that the railroad had fully complied with the Secretary's directions for removing the old bridge, and that it was entitled to rely on those directions as an "authoritative determination of what was reasonably necessary to be done to insure free and safe navigation" at that time. *Id.* at 208, 43 S.Ct. at 27. The fact that the old piers later became an obstruction was due to "changes of a most radical character" brought about by the government's dredging activities. The Court ruled that the railroad was not negligent in failing to anticipate the effect of such changes. *Id.* at 209, 43 S.Ct. at 27.

Because the City in the present case originally complied with the minimum Corps of Engineers specifications for demolition of the bridge, it contends it cannot be held liable for subsequent changes that resulted in the pier's becoming a submerged hazard. But we do not find *Southern Pacific* controlling. We do not think *Southern Pacific* stands for the proposition that compliance with government specifications for removing a bridge forever insulates the bridge owner from liability for damages later caused by the bridge remains. Compliance with the government's specifications in *Southern Pacific* demonstrated only that the owner was not negligent in the way it removed the bridge piers at the time of the original demolition; in the present case the compliance with government specifications, *in itself,* established nothing about whether the owner was negligent in failing to take action later, if changed conditions made the pier remains hazardous.

This latter question turns instead on whether the owner could reasonably have anticipated, under the particular circumstances of the case, the effect of those changes. In *Southern Pacific* the Court emphasized that the changes in the river bed "were not due to natural causes, whose effect could reasonably have been anticipated," so that the railroad would have had to

take action. *Id.* at 210–211, 43 S.Ct. at 27–28. Rather, the railroad was not negligent because it was not "required to take notice of such radical changes as occurred here by the acts of the government over which it had no control and which it had no reason to anticipate or provide against." *Id.* at 211, 43 S.Ct. at 28.

More recent decisions support our interpretation of *Southern Pacific.* For example, in *United States v. New York Central Railroad Co.,* 252 F.Supp. 508 (1965), *aff'd,* 358 F.2d 747 (1st Cir.1966), railroads that erected a bridge in accordance with a permit granted by the Secretary of War argued that their subsequent failure to remove parts of the bridge could not subject them to liability for creating an unreasonable obstruction to navigation. The *Central Railroad* court emphatically rejected this interpretation, stating:

A fortiori, the fact that a bridge was originally properly licensed does not mean that after it has been formally abandoned, the railroad has no liability for the remains of the bridge when they constitute a danger and obstruction to navigation ....

... Permission to erect such a bridge ... does not give an indefinite right to maintain it under changed conditions .... Granting that the bridge involved here was a reasonable and proper obstruction when it was built, .... it [later] became an unreasonable obstruction, for whose existence the railroad was responsible.

*Id.* at 511. *Accord, Orange Beach Water, Sewer and Fire Protection Authority v. M/V Alva,* 680 F.2d 1374, 1382–83 (11th Cir.1982); *United States v. Illinois Terminal Ry. Co.,* 501 F.Supp. 18 (E.D.Mo.1980).

Thus, acceptance of the City's contention that it complied with the government's specifications when it demolished the bridge in 1955 does not settle the question whether it was liable for damage caused by the bridge pier after it became submerged. Here, unlike *Southern Pacific,* the fact that the pier remains became a hazard was not the result of "radical changes" in river conditions caused by the actions of a third party. The district court did not make specific findings as to the reason that the pier became submerged, although there is evidence in the record to support the implication that the pier sank below the waterline as the result of several collisions with river traffic.

We need not speculate whether the City could reasonably have anticipated the cause of the hazardous condition. The evidence clearly establishes that the City was well aware of the risk posed by the submerged pier. This fact alone distinguishes *Southern Pacific,* in which the Court noted that the railroad had no actual knowledge either of the changed conditions that caused the piers to protrude or of the danger created by the obstructions. *Southern Pacific Co. v. Olympian Dredging Co.,* 260 U.S. at 207, 43 S.Ct. at 26–27. Here, on the other hand, the City's own attorney testified that well before the accident, it was obvious that the pier had sunk below water level.

Nevertheless, the City continued to sell water to river boats at a hydrant within several hundred feet of the submerged pier, thus increasing the likelihood of collisions. Moreover, there is undisputed evidence that several vessels had grounded on or struck the pier remains. Both expert witnesses at trial testified that they had struck the obstruction, despite their familiarity with the area and knowledge of the pier's general location. Thus, the City cannot escape liability for negligence under *Southern Pacific* by claiming that the changed conditions creating a hazard were unforseeable and beyond its control, for the evidence is to the contrary.

■ The City next claims that it is entitled to judgment as a matter of law because it legally abandoned the bridge pier. The City asserts that its failure to take any action with respect to the pier since the demolition of the bridge is evidence that it has met the common law requirements for abandonment. In addition, the City argues by analogy to the criteria under maritime law for abandonment of sunken vessels.

The plaintiff and the United States, on the other hand, cite various evidence to support the conclusion that the City did not intend to, nor did it affirmatively act to, abandon the piers.

The trial court did not make any finding respecting the claim of abandonment, but we do not think this was necessary. Assuming *arguendo* that abandonment could be established, this would not relieve the City of liability. In the case of sunken vessels, the law is clear that one may not simply abandon a wreck, thereby escaping further responsibility for it, where the vessel was sunk negligently. *E.g., Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 206–09, 88 S.Ct. 379, 388–89, 19 L.Ed.2d 407 (1967); *Tennessee Valley Sand and Gravel Co. v. M/V Delta,* 598 F.2d 930, 934 (5th Cir.1979). Thus even accepting the validity of the City's analogy, the district court's conclusion that the City was negligent in failing to remove the bridge pier remains would seem to preclude the availability of abandonment as a defense. More to the point, the characterization of a bridge as having been "abandoned" (for various purposes) has not affected the willingness of the courts to hold the former owner of the bridge responsible for the obstruction to navigation created by its decaying remains. *See United States v. Illinois Terminal Ry. Co.,* 501 F.Supp. at 20; *United States v. New York Central Ry. Co.,* 252 F.Supp. at 511. The district court found that the bridge pier was a hazard to navigation, which the City had created and negligently failed to remove from the waterway. These findings are not clearly erroneous. Therefore, the City's claim of abandonment does not relieve it of liability for its failure to remove the pier.

Finally, the City argues that the evidence does not support the district court's determination that it was liable for the accident. The City argues that it cannot be liable for negligence, because it had no common law duty either to remove the pier, mark the pier or warn the Coast Guard or the public of the pier. The City says that because it was not negligent in constructing the bridge, or in demolishing it later, any liability for the bridge remains must be established through demonstration of a statutory violation, which the City denies.

■ The City's argument ignores the important fact that it can be held liable for negligently maintaining the bridge pier, even if it were not negligent in originally building or demolishing the bridge. The law clearly recognizes a duty, based on 33 U.S.C. § 403, not to create obstructions to navigation. This duty is breached where a structure not initially an obstruction becomes one due to improper maintenance. *Orange Beach Water, Sewer and Fire Protection Auth. v. Alva,* 680 F.2d at 1382–83. *See also United States v. Illinois Terminal Ry. Co.,* 501 F.Supp. at 20; *United States v. New York Central Ry. Co.,* 252 F.Supp. at 511. For example, in *Orange Beach,* the plaintiff maintained an underwater pipeline that was struck by a passing vessel. The pipeline originally had been buried but became exposed as the result of improper maintenance. The construction of the pipeline was approved by the Corps of Engineers, but the court nevertheless held that the failure to maintain the pipeline resulted in the creation of an unreasonable obstruction to navigation, which contributed to the accident.

In the case before us, the evidence fully supports the district court's ruling that the City was negligent in failing to remove the pier remains after they became a hazard to navigation. Although the government's minimum specifications at the time of the bridge demolition allowed the City to leave certain bridge piers in place, the City did not continue to maintain these bridge piers "in place"—that is, above the waterline. Pier No. 1 had been completely submerged for a number of years prior to the accident, and the undisputed evidence established that the City was fully aware of this fact. The City also knew that tow boats were attracted to the area, because the City sells fresh water at a site several hundred feet from the submerged pier. Further, boats struck the underwater pier with some fre-

quency, and the City offered no evidence to dispute the conclusion that the pier remains were a hazard to navigation. Under the circumstances, the trial court's conclusion that the City was negligent in failing to remove the obstruction was fully supported by the evidence. Given this conclusion, we need not consider the validity of the plaintiff's claimed statutory bases for liability.[1]

### III.

■ The United States also argues that it should not have been found liable to the plaintiff. The government's first contention is that since it cannot be liable on any direct claim by the plaintiff against it, because the statute of limitations has run, the City has no claim for contribution either. The accident occurred on June 17, 1979. On June 11, 1981, the plaintiff timely sued the United States in the federal district court for the Eastern District of Missouri, and then the following day sued the City of Beardstown in the United States District Court for the Central District of Illinois. In order to consolidate the cases, counsel for plaintiff advised the City that it would voluntarily dismiss its complaint against the United States in the Missouri court if the City would file a third-party complaint against the United States in the Illinois suit. Pursuant to that agreement plaintiff dismissed its suit against the government on October 13, 1981. The City filed its suit against the United States on November 4, 1981, more than two years after the accident.

The Suits in Admiralty Act provides that suits under it may be brought against the United States only within two years after the cause of action arises. 46 U.S.C. § 745. Noting that the plaintiff's cause of action against the United States would have arisen at the time of the accident, the government correctly states that a direct suit by the plaintiff would now be barred. But the government goes farther than this, arguing that as a result of its lack of liability to the plaintiff, it cannot share joint liability with the City, and therefore the City can have no claim of contribution against it. In support of this proposition, the government cites numerous cases in which one joint tortfeasor was immune from tort liability to the plaintiff, and the court held that it could not be held liable in contribution to the other tortfeasor. For example, in *Halcyon v. Haenn Ship Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), an employer and a third party jointly caused injury to an employee. The employer was immunized by the Longshoreman's Act from a direct suit by the employee, and the court held that it would not create a previously unrecognized right to contribution so that the third party could recover from the employer. On the other hand, the United States attempts to distinguish similar cases, such as *Weyerhaeuser S.S. Co. v. United States,* 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963), in which a long-established right to contribution was applied against the United States despite the recognition that the plaintiff could not have brought direct suit against it. The thrust of the government's rather complex argument is that, by analogy to the *Halcyon* line of cases, it cannot be indirectly liable in contribution since direct suit against it by the plaintiff is barred by the statute of limitations.

We need not explore the government's list of arguably analogous precedent, since there are other and more persuasive cases involving statute of limitations defenses,

---

1. We note, however, that the evidence would also support a conclusion that the City violated § 10 of the Rivers and Harbors Act, 33 U.S.C. § 403. That provision prohibits the "creation of any obstruction not affirmatively authorized by Congress" to navigation. Courts have construed this section very broadly, *see, e.g., United States v. Republic Steel Corp.,* 362 U.S. 482, 491, 80 S.Ct. 884, 889, 4 L.Ed.2d 903 (1960); *Norfolk and Western Co. v. United States,* 641 F.2d 1201,

1210–11 (6th Cir.1980), and have found violations on facts very similar to this case, *see Orange Beach Water, Sewer & Fire Protection Auth. v. M/V Alva,* 680 F.2d at 1374; *United States v. Illinois Terminal Ry. Co.,* 501 F.Supp. at 18. Of course, noncompliance with the statute may be used as evidence of negligence. *See, e.g., Orange Beach Water, Sewer & Fire Protection Auth. v. M/V Alva,* 680 F.2d at 1382–83.

which are directly on point. The district court in this case disposed of the government's statute of limitations argument in rejecting its motion for summary judgment, holding that "the third-party complaint and § 745 statute of limitations are governed by when a final judgment or payment is received by a third party." We find this to be a correct statement of the law. In *Thornton v. Hull*, 515 F.Supp. 715 (D.Mass.1981), the plaintiff's ship sank while it was tied to a pier owned by the Town of Hull, and the plaintiff timely brought suit against the town. More than two years after the sinking, the town filed a third-party complaint impleading the United States as third-party defendant, alleging that the United States was liable to it either in indemnification or contribution. The United States contended in that case as it does in this one that because the two-year statute of limitations on admiralty actions against the United States would bar any direct action by the shipowner, a third-party action by the town against the United States was also precluded. The court stated:

> A defendant's right to seek indemnification or contribution is distinct from a plaintiff's right of recovery. To maintain a cause of action against a third-party defendant, the third-party plaintiff must allege facts which will support recovery under either of the above theories. The third-party plaintiff's rights are governed by a different statute of limitations which does not begin to run until there is a final judgment or until the third-party plaintiff has paid the original plaintiff .... Such a rule ensures that the loss is distributed among those

responsible for the harm and prevents one tortfeasor from being saddled with the entire liability solely because of the plaintiff's choice of defendants ....

*Id.* at 716. *See also Chicago, Rock Island & Pacific Ry. Co. v. United States*, 220 F.2d 939, 942 (7th Cir.1955) (rejecting claim that third-party plaintiff's suit against the Government for indemnity under the Tort Claims Act "could be barred before it came into existence" by the statute of limitations applicable to the original plaintiff); *Central Soya Co. v. Economy Boat Store*, 411 F.Supp. 214 (E.D.Mo.1976) (cause of action under 46 U.S.C. § 745 for purposes of third-party claim for indemnity against the United States arises only when judgment is entered against indemnitee).

■ The United States also argues that it is not liable for any negligence the Coast Guard may have been guilty of in maintaining the buoy.[2] The government recognizes that the good Samaritan doctrine is applicable, so that once the Coast Guard voluntarily assumed the duty to mark the pier, it also undertook the obligation to use due care in doing so. *See, e.g., Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). It contends, however, that the causation requirement of that doctrine has not been met, since the trial court did not make explicit findings that the plaintiff's pilot relied to his detriment upon the government's marking of the submerged pier.

■ Obviously, some type of reliance is necessary to establish that governmental negligence was a cause of the injury. *See Indian Towing*, 350 U.S. at 69, 76 S.Ct. at 126; *Estate of Callas v. United States*, 682

2. In addition, the government disputes the trial court's finding that the Coast Guard failed to exercise due care in maintaining the buoy. This contention is without merit. A river boat pilot, Mark Elbrecht, testified that he had navigated the area of the submerged pier almost daily, that the buoy had been missing for several months before the accident and that he had notified the Coast Guard at least three times that the buoy was missing but to his knowledge the buoy was never replaced. Master Chief Donald Urquhart, on the other hand, testified that he had inspected the area three or four times be-

fore the accident and had observed the buoy in place. The government attempts to reconcile this testimony in order to demonstrate that it was not negligent by hypothesizing that the buoy could have been repeatedly replaced and washed away. The evidence does not support this inference, however. The trial court found "no reason to doubt" the testimony of Captain Elbrecht, even though it was contradicted by the testimony of Chief Urquhart. It weighed the conflicting evidence and its finding is not clearly erroneous.

F.2d 613 (7th Cir.1982). The United States argues that the plaintiff's pilot did not rely to his detriment upon the buoy, since he knew that a buoy was usually present to mark the submerged pier but proceeded despite his knowledge that the buoy was absent. Therefore, the government argues, this case is unlike *Indian Towing*, in which the failure to keep a lighthouse beacon operating resulted in a ship's running into an island. Here, the absent buoy "continued to perform its function and warn of the submerged pier."

This argument seems to defy common sense. The issue is not, as the United States suggests, whether the buoy "performed its function" of warning of the pier's *existence*—that is, conveying the information that the area was unsafe, a circumstance about which pilots might otherwise be deceived. The issue is instead whether the buoy performed its function of marking the *location* of the pier. In this respect this case is very similar to *Indian Towing*. There was no question in *Indian Towing* that the pilot of the vessel that ran aground knew about the lighthouse. The danger presented by the government's failure to maintain the lighthouse properly arose not from any implied representation that the island no longer existed, but from the fact that the government "engendered reliance on the *guidance* afforded by the light." *Indian Towing Co. v. United States*, 350 U.S. at 69, 76 S.Ct. at 127 (emphasis added). Because here the buoy was absent, the pilot was forced to estimate the position of the pier by using approximate geographical reference points that he had calculated in relation to the previously observed position of the buoy. Thus the pilot clearly relied to his detriment on the government's undertaking to mark the location of the submerged pier, and the government's failure to use due care in marking the submerged pier was negligent.

## IV.

Both the City and the United States assert that the finding that the plaintiff's pilot was not negligent is clearly erroneous. First, they contend that the pilot, Robert Barber, was aware of the general location of the submerged pier but decided to traverse the area even though he had not been in the vicinity for over a year and knew the buoy was missing. In addition, Barber did not consult the United States Corps of Engineers charts of this Illinois waterway before embarking from the Beardstown shoreline. Finally, the evidence showed that Pilot Barber did not have his marine radio turned to the navigational channel for monitoring purposes, and so was unable to receive the transmission of another riverboat pilot who tried to warn him away from the bridge pier.

Despite the fact that Barber had not been in the area of the submerged pier for over a year before the accident, the evidence indicated that he had previously navigated that area many times, and was thoroughly familiar with it. Although he did not consult the river chart, this would not have helped him avoid the pier since the chart only disclosed the pier's general location and Barber already knew this. Moreover, the evidence showed that Barber's radio was tuned to another channel so that he could communicate with the lock and dam through which he had been waiting for permission to pass—a common and necessary practice. As the district court noted, both of the expert witnesses at trial testified that Mr. Barber acted in a reasonable manner even though he did not consult the charts or hear the radio warning. Thus there was adequate support for the court's finding that Pilot Barber was free from fault.

## V.

The final set of issues to be considered relates to the trial court's award of interest on the judgments against the City and the United States. The court properly applied the comparative fault rule of *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), and determined that the United States and the City of Beardstown were each liable for

fifty percent of the damages resulting from the collision. The parties stipulated that plaintiff's damages were $38,851.75 for repairs to its vessel. The district court concluded that 12% interest from the date of the collision was an appropriate rate for the defendant City to pay with respect to its liability, but, pursuant to 46 U.S.C. § 743 and § 745, interest on the judgment against the United States should be limited to 4% from the date the lawsuit was filed. In a supplemental order dated September 1, 1983, the court amended the judgment to specify that while defendants are jointly liable for the entire amount of the stipulated damages, the City is required to pay the 12% interest rate on only 50% of the stipulated damage amount.

The City argues that the district court abused its discretion in awarding prejudgment interest on the judgment against it, and alternatively contends that the rate of 12% is excessive. As the district court noted, the general rule in admiralty, in order to fully compensate the plaintiff, is to award prejudgment interest from the date of an accident. *United States v. Peavey Barge Line*, 748 F.2d 395, 401–402 (7th Cir.1984); *Bunge Corp. v. American Commercial Barge Line Co.*, 630 F.2d 1236, 1242 (7th Cir.1980). Indeed, a denial of interest in the court's discretion is only appropriate where special circumstances appear, such as the assertion of frivolous claims or a delay in bringing the action. *United States v. Peavey Barge Line*, 748 F.2d at 402. Other factors relevant to a determination whether exceptional circumstances merit a denial of prejudgment interest include whether the parties were mutually at fault and whether there were substantial grounds for uncertainty as to liability and the extent of damages. *First National Bank of Chicago v. Material Service Corp.*, 597 F.2d 1110, 1121 (7th Cir. 1979). We think the district court did not erroneously reject the contention that unusual circumstances were present here and properly exercised its discretion to award interest.

With respect to the rate of interest awarded, this determination is also within the trial court's discretion. *United States v. Peavey Barge Line*, 748 F.2d at 402. Factors relevant to the appropriate rate are the judgment creditor's actual cost of borrowing, state law or other reasonable guidelines indicating a fair level of compensation. *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1101 (5th Cir.1981). In setting the rate here at 12%, the court below considered the statutory rate of interest for judgment creditors in Illinois, which is 9%, *Merit Ins. Co. v. Leatherby Ins. Co.*, 728 F.2d 943, 945 (7th Cir.1984), as well as the prime rate of interest, which closely approximates plaintiff's cost of borrowing, and which fluctuated between 11½% and 21½% after the collision. The City argues that the statutory interest rate of the state in which the Court is sitting is the appropriate measure, and notes that the trial court cited the statutory interest rate of 9% applicable generally in Illinois rather than the 6% statutory interest rate applicable to governmental units under Ill.Rev.Stat. ch. 110, § 2–1303.

We do not think this reference by the district court, even if erroneous, made its award of interest at the rate of 12% an abuse of discretion. The statutory rate is only one factor the court considered, and reliance on the statutory rate of interest in the state in which the court is sitting is now disfavored. *See Arco Pipeline Co. v. S.S. Trade Star*, 693 F.2d 280 (3d Cir.1982); *United States v. M/V Gopher State*, 614 F.2d 1186 (8th Cir.1980). Courts have increasingly looked to the prevailing interest rate—which here never fell below 11½% —as a better indicator of just compensation. *See General Facilities, Inc. v. National Marine Service*, 664 F.2d 672, 674 (8th Cir.1981); *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d at 1101; *United States v. M/V Gopher State*, 614 F.2d at 1190. For these reasons we find that the district court's determination that 12% is an appropriate rate of interest on the judgment against the City was not an abuse of discretion.

Finally we must consider the plaintiff's argument that the district court erred in requiring the City to pay 12% prejudgment interest on only 50% of the stipulated damage amount. The court correctly noted that since the government's liability is premised on 46 U.S.C. § 742, interest on the judgment against the government is limited to the 4% rate of interest prescribed in 46 U.S.C. § 743, and may only run from the date of the filing of the lawsuit rather than the date of the accident, 46 U.S.C. § 745. *Coyle Lines v. United States*, 198 F.2d 887 (5th Cir.1952); *United States v. Eastern S.S. Lines*, 171 F.2d 589 (1st Cir. 1948); *Stoddard v. Ling-Temco-Vought, Inc.*, 513 F.Supp. 314 (C.D.Cal.1981), *remanded on other grounds*, 711 F.2d 1431 (9th Cir.1983). Apparently for this reason, the district court structured the judgment so that the plaintiff would receive 50% of its damages from the United States, with 4% interest on that amount computed from the date the suit was filed, and 50% of its damages from the City, with 12% interest on that amount computed from the date of the accident.

Plaintiff argues that limiting its recovery of 12% prejudgment interest to only half of its damages prevents it from being made whole. Recognizing the statutory restriction on interest chargeable to the government, the plaintiff argues that the inequity caused by the statute should be borne by the City, one of the joint tortfeasors, rather than by Central Rivers, the party damaged. Central Rivers notes that the general rule applicable to joint tortfeasors is that the injured party may recover the full amount of its damages from either one of them; at that point the proportionate fault rule operates to allow a joint tortfeasor that has paid more than its proportionate share of damages to obtain contribution from the other tortfeasor for the excess amount. Further, says Central Rivers, when for some reason one defendant is unable to contribute its full share of the liability, the plaintiff still may recover in full from the other defendant—as for example, where one joint tortfeasor is insolvent but the other tortfeasor nevertheless is compelled to pay the total judgment to the plaintiff. Therefore the plaintiff contends that the City should pay to it 12% prejudgment interest on the entire amount of the damages, in turn recovering whatever it is entitled to receive from the government. The City responds to this argument by noting that the trial court might well have awarded the plaintiff a lower prejudgment interest rate if it knew that the City would have to pay the entire amount, as for example if an insolvent defendant were involved as a joint tortfeasor.

We find the plaintiff's argument on this point persuasive. The rule in admiralty is that the plaintiff may recover the full amount of its damages from either of two joint tortfeasors. *See Bangor & Aroostook R. Co. v. Ship Fernview*, 455 F.Supp. 1043, 1065 (D.Maine 1978); *Complaint of Sincere Navigation Corp.*, 447 F.Supp. 672, 674 (E.D.La.1978). Thus Central Rivers should be able to recover from the City the full amount of its damages plus prejudgment interest at a rate sufficient to fully compensate it, regardless of the amount the City can recover from the United States on the basis of the government's proportionate share of the fault. Here, the district court found that 12% was the interest rate necessary to make the plaintiff whole. We reject the City's argument that the district court might have awarded a lower rate had it known the City would have to pay prejudgment interest on the entire amount of the damages. The trial court in its original opinion, before the judgment was modified to require the City to pay interest on only half the damages, deemed 12% to be the appropriate interest rate for the City to pay on its liability. Equitable considerations suggest that the City should bear any shortfall occasioned by the statutory limitations on interest that may be assessed against the government. Therefore we hold that Central Rivers may recover the full amount of its judgment from the City, plus interest from the date of the accident at 12%.

█ Of course, the City may in turn recover half of the judgment from the

United States pursuant to the trial court's determination that the United States was 50% at fault for the accident. A question is thus presented, however, as to the proper method for computing the interest that the government owes the City: should the government have to pay only 4% interest on half of the stipulated damages amount, or 4% on half the total amount the City must pay to the plaintiff? Because the United States is liable to the City in contribution, rather than directly liable to the plaintiff, logic suggests that the government should pay 50% of the City's total liability, since it was 50% at fault. *See Complaint of Sincere Navigation Corp.*, 447 F.Supp. 672, 675 (E.D.La.1978). Yet part of the total amount that the City must pay to the plaintiff represents prejudgment interest assessed at 12% on the judgment against the City in favor of the plaintiff. To require the government to pay interest on this amount would seem to contravene the statutory limitations in 46 U.S.C. § 743 and § 745.

We have found one case in which this point was considered. In *Complaint of Sincere Navigation Corp.*, 447 F.Supp. at 672, a ship owned by the Sincere company and a ship owned by the United States were both at fault in causing the plaintiffs' personal injury and property damages. The court held that Sincere's ship was 35% at fault and the government's ship was 65% at fault. Sincere satisfied the full judgment in favor of the plaintiffs, which included prejudgment interest, and then sought to collect from the United States 65% of the total amount it had paid to the plaintiffs. The government admitted its liability for 65% of the principal amount that Sincere paid to the plaintiffs. It nevertheless denied liability for that proportion of the interest paid by Sincere that accrued prior to the entry of judgment against the government, because the Public Vessels Act, on which the government's

liability was predicated, prevents recovery of prejudgment interest against the United States.[3]

The court decided the issue against the government, reasoning:

> The judgment against the United States is for 65% of the sums paid by Sincere. This entitles Sincere to recoup 65% of whatever it has paid out to the claimants for amounts due prior to [the date judgment was entered], whether denominated interest or principal. As to Sincere, this is not pre-judgment [sic] interest. It is the recovery of principal. Had the claimants sued the United States directly, (assuming that they would have had a right to do so), they could not have collected pre-judgment [sic] interest. But they sued Sincere and recovered from them principal, interest and costs.
>
> ... There was a judgment against the United States. It appears that the statute fixes the rate of interest from that time forward .... When the United States reimburses Sincere for 65% of its total outlay, it does not pay principal or interest as such: it repays Sincere for a portion of the damages Sincere sustained. Sincere's claim is for the "detention of money," .... It is not a claim for interest on damages for personal injuries or property damages suffered.

*Id.* at 675 (citations omitted).

The court thus held that the government was liable for 65% of the total damages sustained by Sincere, which included interest to the date of judgment at the rate paid to the plaintiffs, plus interest from the date of judgment on that amount at 4%, the statutory rate. *Id.* We find the court's reasoning persuasive here. The judgment against the United States is properly seen as a judgment in contribution for 50% of the amount payable by the City to plaintiff for the total of plaintiff's damages. The fact that that amount includes prejudgment

---

**3.** Under the Public Vessels Act, the government can only be compelled to pay 4% interest on a judgment from the date of judgment, *Complaint of Sincere Navigation Corp.*, 447 F.Supp. at 675, whereas under the Suits in Admiralty Act, 4%

interest may be assessed as early as the date a lawsuit is filed. 46 U.S.C. § 743, § 745. *See Coyle Lines v. United States*, 198 F.2d 887, 888 (5th Cir.1952).

interest assessed against the City does not violate the provisions of the Suits in Admiralty Act under these circumstances. *Cf. Weyerhaeuser S.S. Co. v. United States,* 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963) (divided damages rule not affected by statute governing United States' liability to employee, so government liable for its share of total amount paid by shipowner including settlement to employee).

Further, 46 U.S.C. § 743, which limits interest on claims against the United States to 4%, and 46 U.S.C. § 745, which limits interest on claims to the period after a claim is filed, relate to "interest" on "claims." Here, the City's *claim* against the government properly is for 50% of the amount for which the City is liable to the plaintiff, which liability includes 12% interest from the date of the accident. The government may only be compelled to pay *interest* on that claim at the rate of 4% from the date the suit was filed. As the court in *Complaint of Sincere Navigation Corp.,* 447 F.Supp. at 672, makes clear, the fact that a party's claim against the government may include amounts representing interest charged to that party does not violate the statutory provisions.

The district court's opinion is affirmed in all respects except for its computation of the City's and the government's liability for interest on the judgment. The City is liable for 100% of the plaintiff's damages, including interest from the date of the collision at the rate of 12%. The government is liable to the City for 50% of what the City pays to the plaintiff for amounts due prior to November 4, 1981, the date the City's claim against the government was filed. The government may also, in the district court's discretion, be required to pay 4% interest on its liability from the date the suit was filed. *See Coyle Lines v. United States,* 198 F.2d at 887. The judgment is affirmed in part and vacated and remanded in part; and the cause is remanded for appropriate recomputation of the amount of liability and for other proceedings not inconsistent with this opinion.