**Michael LANDOWSKI and Diane
Landowski, Plaintiffs-Appellants,**

v.

**GRAND TRUNK WESTERN
RAILROAD COMPANY,
Defendant-Appellee.**

**No. 85–1649.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 14, 1986.
Decided June 24, 1987.

Robert N. Dunn (argued), Detroit, Mich., Jaimie A. Kleinstiver, for defendant-appellee.

James C. Howell (argued), Otto and Otto, Saginaw, Mich., for plaintiffs-appellants.

Before NELSON and RYAN, Circuit Judges, and ENSLEN, District Judge.[*]

RYAN, Circuit Judge.

The Landowskis appeal the trial court's dismissal of their action alleging that defendant Grand Trunk Western Railroad Company ("the Railroad") maintained a nuisance upon the navigable waters of the Saginaw River which caused a boating accident in which Michael Landowski was injured. The trial court dismissed the action on the ground that the nuisance existed pursuant to a permit issued to the Railroad by the federal government and that, as a result, the Railroad is immune from liability.

We affirm.

## I.

In 1912, the Railroad obtained a permit from the War Department to construct a bridge across the Saginaw River. The bridge stood for 30 years until the Railroad, under a permit issued by the War Department, removed the entire steel superstructure of the bridge, as well as three of the "piers" or masonry units upon which the superstructure had rested. Five piers, however, were left in place. The result was a widened navigation channel with five piers, numbered one through five, protruding from the shallower water outside of the marked navigation channel. Pier number five was closest to the channel, approximately 150–200 feet away, and stood in the geographic center of the river. The War Department's decision to allow the piers to remain in the river was expressly based upon an engineer's report, which stated that: "It does not appear that the remaining piers will provide an unreasonable obstruction to small boat navigation."

The permit stated:

"[This permit] does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State or Local Laws or Regulations, nor does it obviate the necessity of obtaining State assent to the work authorized. It merely expresses the assent of the Federal Government so far as concerns the public rights of navigation. *Cummings v. Chicago,* 88 [188] U.S. 410 [23 S.Ct. 472, 47 L.Ed. 525 (1903)]."

The permit was also made subject to certain conditions, including:

"(f) That if future operations of the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of War, it shall cause an unreasonable obstruction to the free navigation of said water, the owner will be required, upon due notice from the Secretary of War, to remove or alter the structural work or obstructions caused thereby without expense to the United States, so as to render navigation reasonably free, easy and unobstructed ...

"(h) That if the display of lights and signals on any work hereby authorized is not otherwise provided for by law, such lights and signals as may be prescribed by the U.S. Coast Guard, shall be install-

---

* The Honorable Richard A. Enslen, United States District Court for the Western District of Michigan, sitting by designation.

ed and maintained by and at the expence of the owner."

Some time after the Railroad removed the bridge, the public boat ramp was moved closer to the piers. Over the years, small boat traffic in the area increased significantly. In the early 1960's, the Mayor of Bay City sought to have the piers removed, but the Army Corps of Engineers declined to take action. There is evidence that at least one accident involving the piers occurred prior to the accident that gave rise to this litigation.

In 1982, 40 years after the removal of the bridge, appellants went boating on the Saginaw River with several friends. Michael Landowski was at the wheel of his 18–foot speedboat. By the end of the evening, it had become quite dark on the water, Michael Landowski was legally intoxicated, and the party was cruising at something over 30 miles per hour up the river. The boat struck pier number five, which at that time protruded approximately three feet above the water. One of the passengers died; others were injured.

## II.

Appellants sued both the Railroad and the United States. Summary judgment was granted in favor of the United States. This appeal is addressed only to the dismissal of the Railroad.

Appellants relied at trial upon a common law theory of intentional nuisance. At the close of the evidence, the trial court, sitting as the trier of fact, found that the pier was a nuisance, an "unreasonable hazard." He also found that the appellants had both been injured as a result of this hazard, Michael suffering $95,000 worth of damages, and Dianne $10,000. Finally, he found that Michael's comparative negligence was 90%. When pressed by counsel, the judge noted that, while the Railroad certainly "intended to leave it there," their "fault, if any, is in negligence, not in intentional wrong."

The trial court then noted, apparently as a conclusion of law, that he saw "no preemption to apply comparative negligence to the damages." All of these findings, however, were made provisionally, in event that this court should reverse the trial court's dispositive legal holdings, as follows:

"Congress has given the Secretary of War, the Corps of Engineers, if you will, the authority to make a determination of what is and what is not a hazard at the time. They have given them the authority to cause it to be removed.

"I agree 100 percent with the logic of the cases cited by counsel, the Potomac River case, that in effect says that there is absolutely immunity to a railroad or anybody else that puts in a railroad or an object or leaves in an object with a permit, and for that reason, I think there should be a grant of no cause of action."

## III.

The trial court rested its dismissal upon principles stated in *Potomac River Association v. Lundeberg Maryland Seamanship School, Inc.*, 402 F.Supp. 344 (D.Md. 1975). *Potomac* was a suit by two environmental organizations against a private company, the United States Army Corps of Engineers, and certain named federal employees. The private company obtained permits from the Corps to dredge and fill a Maryland creek. The plaintiffs resorted to various federal statutes and other theories in order to halt the desecration of the creek, arguing both that the permits should not have been issued and that the company's activities had gone beyond what the permits authorized. Among other things, the court analyzed the Corps' obligations under the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 et seq. (1986).

The district court in *Potomac* reviewed the criteria the Corps must take into account in considering permit applications under § 10, the same section under which the permit was issued in this case, and noted: "It is clear, then, that the Corps has been given the task of deciding to which uses the navigable waterways of the United States should be put." *Id.* at 355. The *Potomac* court concluded that the environmentalists could maintain an action against the private company only to the extent that the company's activities had exceeded the scope of its permits. As to the activities within the scope of the permits, the court held:

"The maintenance of a cause of action by one private party against another for injunctive relief or damages due to injury caused by a use which has already been implemented and which has received the Corps' authorization would interfere with the permit scheme established by the regulations."

*Id.* at 356. Thus, while the court might entertain such limited review of the Corps' actions in issuing the permits as the Administrative Procedure Act allows, no cause of action against the private defendant premised upon activities authorized by permit could be allowed.

Separately addressing the issue of "whether the five Corps permits issued to the defendants authorizing dredging and filling foreclosed recovery for public or private injury which occurred pursuant to activity under the permits"—specifically, allegations of nuisance—the *Potomac* court concluded that they did. The court explained:

"To put the question in a different light, although under some circumstances pollution of a river which results in the killing of fish may be considered a nuisance, the Corps may immunize acts which would otherwise be nuisances in much the same way as zoning under a state's police power may cause some curtailment of rights by restricting uses. *See, e.g., McMahon v. City of Dubuque*, 255 F.2d 154 (8th Cir.), *cert. denied*, 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958).

"This is merely another way of stating that the Corps of Engineers may regulate the use of navigable waters and may allocate the cost of those uses, because it has been designated the trustee of a common property resource. Once uses of the common property have been authorized, they cannot be nuisances because they have been condoned by the Government."

*Id.* The trial court in this case found the *Potomac* court's reasoning both pertinent and persuasive, and since there were no serious allegations that the Railroad had in any way exceeded the scope of its permit, the trial court dismissed the action against the Railroad.

## IV.

In *Southern Pacific Co. v. Olympian Dredging Co.*, 260 U.S. 205, 43 S.Ct. 26, 67 L.Ed. 213 (1922), the Supreme Court granted immunity to a railroad on facts strikingly similar to those in this case. The railroad in that case dismantled a bridge over the Sacramento River pursuant to specifications provided by the Secretary of War. Those specifications called for the removal of the piers upon which the old bridge rested to a level seven feet below the surface of the river. The railroad actually exceeded these specifications by several feet, cutting the piers down to a level at or below the riverbed. Subsequently, dam building and dredging operations of the United States lowered the riverbed by approximately seven feet. A dredge struck one of the old piers, which by this time protruded several feet above the bed of the river.

The district court dismissed a libel brought by the owner of the dredge. The Court of Appeals reversed, concluding that the railroad could be held liable. The Supreme Court reversed, affirming the district court's dismissal:

"To hold, as did the circuit court of appeals, that [the Secretary of War's] determination afforded no protection to petitioners, but that they relied upon it only at their peril, we think is conclusion without warrant. Having complied with the direction of the Secretary, and having no further interest in anything at that point on the river, it seems altogether unreasonable to hold them to an indefinite and speculative responsibility for future changed conditions. The piles had been removed early in 1896, with an overgenerous observance of the directions of the Secretary. As matters then stood, the removal of the piles, so far as they constituted any obstruction or menace to navigation, was complete; that they afterwards became an obstruction was due to changes of a most radical character in the channel of the river, brought about, in the main, by the dredging operations of the government itself. Was the petitioner guilty of negligence in not antici-

pating the effect of these changes, which did not culminate in the conditions complained of until twenty-two years later? The question must be answered in the negative.

*Id.* at 209, 43 S.Ct. at 27.

We consider *Southern Pacific* to be much better authority for the existence of immunity on the facts before us than the *Potomac* case the Railroad relied upon below. In *Potomac*, the district court considered ongoing dredging activities that were precisely within the scope of a recent government permit. There was no lapse of time between the actions pursuant to permit and the alleged injury, and there were no allegations that the private company had breached a duty to the public by failing to respond to changed circumstances.

Before this court, the Railroad also cites a number of cases generally tending to establish a "rule" that "the courts will not hold conduct to constitute a nuisance where authority therefor exists by virtue of legislative enactment." *Smith v. Tennessee*, 436 F.Supp. 151, 154 (E.D.Tenn.1977). Similarly, in *Ferris v. Wilbur*, 27 F.2d 262, 264 (4th Cir.1928), the court reasoned: "[I]t is unthinkable that the courts should enjoin as a nuisance the use of government property by a co-ordinate branch of the government, the executive, where such use is authorized by a valid act by the other co-ordinate branch, the legislative." In *Southern Pacific*, the Supreme Court expressly refused to distinguish between a legislative enactment and a permit issued in an exercise of executive discretion: "Congress intended by its legislation to give the same force and effect to the decision of the Secretary of War that would have been accorded to direct action by it on the subject." 260 U.S. at 210, 43 S.Ct. at 27. *Southern Pacific* appears to require that we affirm the district court's dismissal in this case.

In *Central Rivers Towing, Inc. v. City of Beardstown*, 750 F.2d 565 (7th Cir.1984), however, the court held that a continuing duty to respond to changed circumstances can exist, and may give rise to liability, despite full compliance with a federal permit. The City of Beardstown demolished a bridge in accordance with Army Corps of Engineers specifications, which provided that several of the bridge piers could remain in place. The piers were to be left visible above the waterline, but, perhaps as a result of several collisions, the piers became submerged. After several accidents, the United States Coast Guard marked the underwater obstruction with a buoy. The evidence established that the City was "well aware of the risk posed by the submerged pier." *Id.* at 569. Over twenty years after the bridge removal, and at a time when the Coast Guard buoy was missing from one of the piers, a tow boat struck the unmarked, submerged pier. The court allowed recovery against both the City and the federal government on a negligence theory, although its reasoning could also lead to the denial of immunity where public nuisance is alleged.

The Seventh Circuit distinguished *Southern Pacific* on its facts as a case where there was "nothing to indicate that either of the petitioners had actual knowledge of the changed conditions which brought about the protrusion of the old piles above the bed of the river, or any knowledge that these piles were a menace to navigation." *Southern Pacific*, 260 U.S. at 207, 43 S.Ct. at 26. In *Beardstown*, on the other hand, the City had actual knowledge of both the changed circumstances and the resulting hazard. Under these circumstances, the Seventh Circuit did not believe the principle of immunity set forth in *Southern Pacific* could be absolute:

"Because the City in the present case originally complied with the minimum Corps of Engineers specifications for demolition of the bridge, it contends it cannot be held liable for subsequent changes that resulted in the pier's becoming a submerged hazard. But we do not find *Southern Pacific* controlling. We do not think *Southern Pacific* stands for the proposition that compliance with government specifications for removing a bridge forever insulates the bridge owner from liability for damages later caused by the bridge remains. Compliance with the government's specifications in *Southern Pacific* demonstrated only that the owner was not negligent in the way it removed the bridge piers at the time of the original demolition; in the

present case the compliance with government specifications, *in itself,* established nothing about whether the owner was negligent in failing to take action later, if changed conditions made the pier remains hazardous."

We find this reading of *Southern Pacific* unpersuasive. We note initially that the *Beardstown* court appeared to assume that § 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 (1986), creates a private right of action in favor of those injured by obstructions to navigation. *See Beardstown,* 750 F.2d at 571 n. 1. The implication of such a right was expressly rejected by the Supreme Court in *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). Following the approach taken in *Beardstown* would require us to address the issue (alluded to, but not resolved, in *Sierra Club*) of whether the Rivers and Harbors Act not only fails to create a private right of action, but also preempts recovery on a common-law theory of nuisance for injuries caused by obstructions to navigation. *See Sierra Club,* 451 U.S. at 296 n. 7, 101 S.Ct. at 1780 n. 7. While we need not decide that issue here, we simply observe that the viability, under federal maritime law, of a nuisance recovery for injuries caused by obstructions to navigation is, at best, an open question. With respect to nuisances in the form of water pollution, compare *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 11, 101 S.Ct. 2615, 2621, 69 L.Ed.2d 435 (1981), with *Louisiana v. M/V Testbank,* 752 F.2d 1019, 1030–31 & n. 13 (5th Cir.1985) (en banc), *cert. denied,* — U.S. ——, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

More importantly, we reject the notion that a private party that complies with a federal permit by partially removing structures in a navigable waterway has a continuing responsibility to prevent those structures from becoming navigational hazards. Responsibility for the piers left in the Saginaw River by the Railroad rested squarely upon the federal government. By the terms of the permit itself, it was the duty of the Secretary of War (later, the Secretary of the Army) to determine whether any of the piers had become "an unreasonable obstruction to the free navigation" of the river, and then to order the Railroad to carry out any alterations deemed necessary. The permit also placed responsibility upon the United States Coast Guard to determine whether any lights or signals needed to be placed upon the piers.

Despite the Court's passing reference, in *Southern Pacific,* to the defendant's lack of knowledge of the changed conditions, we do not believe the Railroad's knowledge, or lack of knowledge, is material to its claim of immunity here. Under 33 U.S.C. §§ 1 and 403 (1986), as well as the terms of the permit issued to the Railroad, it is the continuing duty of the Secretary of the Army, and not the Railroad, to prevent obstructions to navigation in the Saginaw River. As the Court declared in *Southern Pacific,* the Railroad here was "justified in proceeding upon the assumption that what the Secretary, in the exercise of his lawful powers, declared to be no obstruction to navigation, was in fact no obstruction." 260 U.S. at 210, 43 S.Ct. at 27. Under these circumstances, we decline to impose liability upon the Railroad.

AFFIRMED.