Mrs. Laura KAISER, wife of/and Ignatius J. Barreca, Plaintiffs,

v.

TRAVELER'S INSURANCE COMPANY et al., Defendants.

Civ. A. No. 71–1424.

United States District Court,
E. D. Louisiana.

May 7, 1973.

Herman M. Schroeder, Schroeder, Kintz & Miranne, New Orleans, La., for plaintiffs.

Robert J. Young, Jr., Young & Wilson, New Orleans, La., for Great American Ins. Co.

Cornelius G. Van Dalen, Deutsch, Kerrigan & Stiles, New Orleans, La., for George Tranchina.

W. K. Christovich, Christovich & Kearney, New Orleans, La., for Coastal Sand & Gravel Co., Inc., and Fidelity & Casualty Co. of New York.

Fred E. Salley, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Henry Brien and Travelers Ins. Co.

CASSIBRY, District Judge:

## FINDINGS OF FACT

1. Frank Barreca, an 18-year-old student at St. Paul's College in Covington, Louisiana, was killed on May 26, 1970 in a water-skiing accident at the end of an afternoon of skiing with some of his fellow students on Bayou Lacombe, a navigable body of water on the north shore of Lake Pontchartrain.

2. Plaintiffs Laura Kaiser Barreca and Ignatius J. Barreca are the surviving parents of the deceased Frank Barreca.

3. Defendant George Tranchina, Sr., a resident of Orleans Parish, Louisiana and the father of George Tranchina, Jr., owned a camp, boathouse and small docking facility on the east bank of Bayou Lacombe and owned the 16-foot, 85-horsepower Thunderbird outboard motor boat pulling Barreca on a slalom ski at the time of the accident.

4. Defendant Henry Brien, Jr.,[1] the operator of the motor boat at the time of the accident, was an experienced water skier and motor boat operator, having had some 1,000 hours experience operating such craft.

5. Defendant Coastal Sand and Gravel Company, Inc. [Coastal], operator of a sand and gravel business on the west bank of Bayou Lacombe, was the owner of the sunken, partially submerged barge on the west bank of the Bayou with which Barreca collided.

6. Bayou Lacombe averages 12′ in depth, and at the location of the accident herein, was about 225′ in width from bank to bank. There is no buoyed channel in that area, for the Bayou is navigable for nearly its full width, having fairly steep, sloping banks. Besides its use for water sports, the Bayou is used also for various commercial activities, including the sand and gravel transport business, a shipyard and mooring facilities.

7. In connection with its sand and gravel business Coastal operated barges used for the carriage of its products by water. One of these barges, the one in suit, had been moved several years prior to the accident from its former position in front of Coastal's plant around the bend from the Tranchina camp to a position almost directly across the Bayou from the Tranchina dock. The barge, some 130 feet in length, 30 feet in beam, and 7 feet in depth, was tied to the bank and immediately adjacent thereto; the barge had taken on some water, and had been deliberately allowed to partially sink, with the result that for about one year preceding the accident approximately 4 feet of the width of the side of the barge which projected more than 20 feet into the waterway was submerged. Coastal had used the barge for a considerable period of time prior to the accident as a temporary mooring and dock facility for arriving tugs and barges. The barge was easily visible and its presence was known to all of the young men who participated in the water skiing on the day of the accident. However, no lights or marker buoys were displayed from it to mark its furthermost intrusion into the Bayou.

8. On May 26, 1970 several of the boys from St. Paul's school, including the decedent Frank Barreca, George Tranchina, Jr., Henry Brien, Jr., and Chris Lockhart, with permission of their superior at the school, Brother George, elected to take a respite from examinations and spend the afternoon water skiing at Tranchina's camp.

9. Tranchina, Sr., permitted the use of his boat for water skiing when he was not present. His son, Tranchina, Jr., was an experienced water skiier and motor boat operator. He gave his son cautionary instructions which the son was supposed to pass on to any others skiing:

    (1) Only a qualified person was to operate the boat;

---

1. Henry Brien, Jr., has become emancipated by marriage and the motion made at the close of the trial to substitute him for his father Henry Brien, Jr., will be granted inasmuch as no objection was made in any of the post-trial briefs.

(2) Ski runs were to be made as agreed upon with neighbors to avoid problems with many using the Bayou for skiing at the same time—stay close to the right bank, always make turns to left which is safest maneuver for skiers;

(3) All skiers to wear ski belts, exercise caution at all times, and not be "horsing around."

10. The boys arrived at the Bayou about 12:30 P.M. and, using a 50-foot ski rope attached to Tranchina's Thunderbird motorboat, began taking turns performing various kinds of waterskiing maneuvers up and down the Bayou.

11. The longest run, and the one usually made, terminated to the south about one-quarter to one-half mile through a railroad bridge, and to the north about "two city blocks" past the pier to a bend where the Bayou forks. There was no set pattern for going north or south from the pier, but by going north and turning around, the skiers had a longer ski run. The better turnaround after finishing the run southward was in the bend north of the pier, but the Bayou was wide enough for turns to be made up and down the length of the run, and skiers did turn around at other places than the north turnaround.

12. Frank Barreca had learned to water ski on two skiis, but was just beginning to learn the more intricate maneuver on one ski, commonly called "slaloming." During the late afternoon Barreca attempted to slalom ski. After his friend Lockhart had made several unsuccessful attempts with Brien, Jr., at the wheel, Barreca undertook to show them he could do it.

13. Water skiing is relatively easy as long as the skier maintains his course in the wake of the towing vessel. The skier can stop his forward motion almost instantly by simply letting go of the tow rope and dropping or sitting down in the water. A cardinal rule is that one should maintain position within the wake of the boat, particularly while executing a turning maneuver, rather than attempting to ski outside the radius of the boat's turn, because the skier, by increasing the radius of his circle thereby, increases the arc of his turn which also increases his speed and decreases control. It is also a cardinal rule to look ahead when one skiis, rather than to look at the stern of the boat.

14. Barreca was necessarily aware of these facts and rules relating to the sport when he commenced his attempt at slalom skiing in this Bayou. He got up on the slalom ski just past the railroad bridge and had difficulty staying on as beginners do. As the boat passed the Tranchina camp, Brien received a motion from Tranchina, Jr., that it was time to go, and instead of continuing to the bend north of the camp, Brien signalled Barreca to stay in the wake as he began to execute a turn to bring the boat back to the Tranchina pier.

15. Instead of staying in the wake, Barreca slalomed outside the wake, thus increasing the turning circle, bringing him closer toward the bank next to which the Coastal barge was lying. Brien, Jr., saw that Barreca was outside the wake, but failed to realize how far outside the wake he would go, and continued his turn rather than taking any precautionary measures, such as stopping the boat. The motor boat itself passed the barge about twenty feet off, but Barreca, watching those in the boat instead of directly ahead, crashed into the submerged edge of the barge and was killed almost instantly. He realized his danger when about 20 feet from the barge, and a look of panic on his face was seen by Lockhart and Brien, Jr., but he never dropped the rope, and was still holding with both hands when he struck the barge. Had he stayed in the wake, he would have cleared the barge by some twenty feet.

## II. CONCLUSIONS OF LAW

1. Bayou Lacombe, a tributary of Lake Pontchartrain, is a navigable body of water, and the accident in suit constitutes a maritime tort giving original jurisdiction to United States District Courts within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Venue is properly laid within this district.

2. Barreca was negligent in disregarding the instruction to stay in the wake of the towing vessel, and in failing to keep a proper lookout toward his direction of travel, and this negligence was a proximate cause of the accident.

3. Brien, Jr., an experienced motor boat operator, was negligent in not realizing the danger that Barreca was in, as an inexperienced slalom skier, while skiing outside the wake when the turn was being made, and in failing to take precautionary measures, and that negligence was a proximate cause of the accident.

4. No serious contention can be made that the partially submerged barge was not sunk in a navigable channel for it is well settled that a "vessel is entitled to the full reach of a navigable stream available to the line of high water, including muds along the shore", Reading v. Pope & Talbot, Inc., 192 F.Supp. 663, 667 (E.D.Pa.1961); aff'd 295 F.2d 40 (CA 3, 1961).

5. One plying navigable waters can rely on markings and need not rely on memory as to where or how a wreck is lying. See Wissahickon, 226 F. 345, 346–347 (W.D.N.Y.1915); Jones Towing v. United States, et al, 277 F.Supp. 839 (E.D.La.1967). Statutory law requires a buoy at the channelward extremities of a wreck nearest the navigable channel. 33 CFR 62.25–40. (The type of lighting and marking is spelled out in 33 CFR 62.25–1, 62.25–5 and note).

Thus, even though a portion of Coastal's barge was visible above water, it was a statutory fault not to buoy the submerged extremity thereof. See Russell, Poling & Co. v. Conners Standard Marine Corp., et al., 151 F.Supp. 11 (S.D.N.Y.), aff'd 252 F.2d 167 (CA 2, 1958).

6. Since Coastal was in violation of the aforementioned statutes, the so-called Pennsylvania Rule applies. [The Pennsylvania, 86 U.S. 125, 22 L. Ed. 148 (1874)]. Coastal, therefore had the burden of showing that its statutory breach not only did not cause or contribute to the accident, but that it could not have caused or contributed to it. This burden has not been overcome. If the wreck had been removed as required, there would have been no fatality. If it had been marked, the markings might have attracted Barreca's attention in time for him to have avoided hitting it. The sunken barge extending into the channel the way it did, narrowed the corridor and obstructed the free use of the waterway. The breach of the statutory duty owed by Coastal was therefore a proximate cause of the accident.

7. Tranchina, Sr., as owner of the motorboat, is vicariously liable for its negligent operation by Brien, Jr., who had his tacit consent to operate the boat, under Louisiana's Uniform Pleasure Boating Act, Louisiana Revised Statutes, Title 34, Section 850.24.

8. The measure of damages is an issue in the case. Plaintiffs have urged the Court to follow this District's decisions in In re Sincere Navigation, 329 F.Supp. 652 (E.D.La.1971), and In re Farrell Lines, Inc., 339 F.Supp. 91 (E.D.La.1971) and award them damages for lost love and affection or "survivors' grief" in this maritime action for death, contending that an award of $35,000 to each parent is proper analogizing the Louisiana wrongful death case, Poston v. Firemen's Ins. Co., La.App., 256 So.2d 700, to this one. At all the pre-trial

conferences in this case I indicated to the parties that I would award damages for survivor's grief in the event I found one or more of the defendants liable for the death, but the Fifth Circuit in Canal Barge Company, Inc. v. Griffith, No. 71–2226, mandate stayed on another issue on June 18, 1973, decided on March 30, 1973 that survivor's grief is not recoverable, and pecuniary loss only is the measure of damages. Under these circumstances I will follow the Fifth Circuit decision and allow recovery for pecuniary loss only, although the matter may not be completely settled in this circuit. In re Sincere Navigation is on appeal awaiting argument. No. 72–2254. Plaintiff Ignatius J. Barreca is awarded $960.30, the funeral expenses for decedent Frank Barreca and the only pecuniary loss proved. This award is reduced by 50% on account of the contributory negligence of Frank Barreca.

■ 9. The contention of George Tranchina, Sr., that he should be cast only as a surety of Brien, Jr., and not as joint obligor is not well founded. While it is true that he is not a joint tortfeasor in the strict sense, but is only vicariously liable and thus is entitled to indemnity from the one whose negligence the law makes him responsible for, Deshotel v. Travelers Insurance Co., 231 So.2d 448 (La.App.1970), aff'd 257 La. 567, 243 So.2d 259 (1971) it is nevertheless recognized generally that the plaintiff is entitled to a judgment casting him jointly. *See* discussion of this issue in 1 Harper and James, The Law of Torts, sec. 10.1 at p. 700.

■ 10. Tranchina, Sr., seeks limitation of liability to the value of the motorboat, represented to be about $1000.-00, under the Limitation of Liability Act, 46 U.S.C.A. secs. 181–189, inasmuch as he had no privity and knowledge of the negligence of Brien, Jr. The amount of the award in this case makes this issue moot.

The Clerk shall prepare judgment accordingly.