SHERIDAN TRANSPORTATION CO.,
and Tug New York Co.,
Plaintiffs-Appellants,

v.

UNITED STATES of America, et al.,
Defendants-Appellees.

No. 86–3822.

United States Court of Appeals,
Fifth Circuit.

Dec. 21, 1987.

Scott R. Wheaton, Jr. and Charles E. Lugenbuhl, New Orleans, La., for plaintiffs-appellants.

David V. Hutchinson, Torts Branch, Civ. Div., Washington, D.C., for defendants-appellees.

Before REAVLEY, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The owners of the barge MARY J. SHERIDAN [SHERIDAN barge] appeal the district court's finding that they were solely to blame for the barge's allision with the submerged wrecks of the GENEVIEVE LYKES and the LETITIA LYKES [the wrecks] in the Mississippi River near New Orleans. We conclude that the district court's findings as to legally relevant facts are incomplete; that the court failed to address certain factual and legal considerations that may absolve appellants of the burden of proving causation under THE PENNSYLVANIA rule; and that as a matter of law, the court erred in finding appellees' conduct within the discretionary function exception to the Suits in Admiralty Act. Accordingly, we VACATE and REMAND for more complete and specific findings of fact and for application of relevant law consistent with this opinion.

## I. BACKGROUND, FACTS, AND PRIOR PROCEEDINGS

### A. *Wrecks and buoys.*

During Hurricane Betsy in 1965, the partially completed steamships GENEVIEVE LYKES and LETITIA LYKES were blown upriver from their moorings at Avondale Shipyards and sank in the Mississippi River at about Mile 115.4 above the Head of Passes [AHP], approximately two miles south of New Orleans International Airport. The two sunken wrecks, extending some 540 feet in length, lie roughly parallel to the left descending bank of the river [the bank]. Their combined width is approximately 200 feet, and their nearest edge is some 250 feet from the bank. The wrecks have not changed location since coming to rest on the river bottom.

The U.S. Corps of Army Engineers [the Corps] maintains a dredged channel known as Fairview Crossing, some 500 feet wide and 40 feet deep, farther into the river, some 300 feet beyond the wrecks. Shortly after the sinking of the wrecks, the Coast Guard established a lighted quick-flashing red wreck buoy 60 feet channelward of the wrecks, according to the Coast Guard's notice to mariners published September 21, 1965.[1] Subsequently published mariners' notices gave no indication that the wreck buoy was located other than 60 feet channelward of the LYKES wrecks. At least once each year the Coast Guard pulled up the buoy's moorings to make sure they were sound, and then reset it, presumably in the same place. For a brief period in April–May 1983, the buoy was missing. But it was found and reset again, presumably in the same place.

The wrecks were not formally abandoned to the United States. The Corps decided against trying to remove them in view of the probable expense, and determined that because the Coast Guard had marked them, the wrecks did not constitute a hazard to navigation.

### B. *The Fleet, charts and light lists.*

In 1976, the Corps granted Point Landing, Inc. a permit to operate a barge fleet-

---

1. Eighth Coast Guard District, New Orleans, La., Local Notice to Mariners, No. 104 of Sept. 21, 1965. The notice stated that the buoy was positioned at Lat. 29–58–00N., Long. 90–17–21W., 60 feet channelward of the wrecks, at mile 115.4. As of that date, the wreck buoy on station was WR12. Local Notice to Mariners, No. 103 of Sept. 17, 1965, stated that buoy WR10 was temporarily established on Sept. 15, 1965, at Lat. 29–58N., Long. 90–17.3W., 60 feet channelward of the wrecks.

ing facility on the left descending bank of the river "central to a point about 116 miles above the Head of Passes." The Corps' Statement of Findings concerning the permit made no mention of the wrecks. A barge fleet, known as Flowers Fleet [the Fleet], was subsequently established along the bank behind the wrecks. According to the Coast Guard's answers to appellants' interrogatories, the Fleet operated from mile 115.2 to mile 115.7 AHP, between 1980 and 1984. Apparently, neither the Coast Guard nor the Corps considered the wrecks a hazard to navigation for traffic coming in and out of the Fleet.

National Ocean Service nautical chart 11370, 10th Edition, dated January 1, 1983, shows the Wreck buoy, WR4, just outside (to the north of) Fairview Crossing; immediately behind the buoy symbol there is a single, black visible wreck symbol. There is no sunken wreck symbol in the immediate vicinity of the buoy symbol on the chart. Charted river depths in the area between WR4 and the bank are shown to be between 72 and 55 feet. A notation on the chart specifically refers to "Lighted Wreck Buoy 'WR4' at Mile 115.4" and advises: "Consult the U.S. Coast Guard Light List and the Local Notice to Mariners for additional information." The 1983 Light List [2] describes WR4 as a "Mississippi River Wreck Lighted Buoy," and states that it is "[c]hannelward of last reported position of wrecks, left bank mile 115.4" at Lat. 29–58–0N. and Long. 90–17.3W. and that it "[m]arks wreck of GENEVIEVE LYKES and LETITIA LYKES." The Light List does not otherwise describe the location of the wrecks or indicate the distance between them and the buoy.

### C. *Prior Contacts with an Unknown Obstruction*

On August 29, 1983, a licensed Associated Federal Coast Pilot, Clifford Watts, was maneuvering an ocean-going tug drawing 13 feet near Flowers Fleet, when the tug bumped against an underwater obstruction. The obstruction was approximately 410 feet from WR4, about 250–300 feet off the left descending bank, and some 100 feet downriver of the buoy. Since the point of contact was so far from the wreck buoy, Pilot Watts believed he had hit a log or some other minor obstruction. He reported the striking to the Corps as an unknown obstruction. Following a sonar survey of the area, the Corps determined on September 6, 1983, that the obstruction was the LYKES wreck.[3] Since the obstruction was found to be out of the channel, the Corps took no action to notify maritime interests about it. It is not clear whether the Corps brought this finding to the attention of the Coast Guard.

### D. *The Allision*

On September 29, 1983, Federal Pilot Russell Belsome was at the helm of the PEGGY SHERIDAN [SHERIDAN tug], which was pushing the SHERIDAN barge upriver towards Flowers Fleet. The ocean-going barge, loaded with fertilizer, was then drawing 23′ 6″ of water. The SHERIDAN tug was 100 feet long; the SHERIDAN barge was 350 feet long. Pilot Belsome had been into the Fleet before. He discussed the approach to the Fleet with the SHERIDAN tug captain, Richard A.J. Bernier, and recommended to him a straight line or standard approach. As the tow approached the designated docking space at the Fleet, Pilot Belsome turned the controls over to Captain Bernier, in

2. Volume II, Atlantic and Gulf Coast, Little River, South Carolina to Rio Grande, Texas, and the Antilles, CG–160, at 229, Government Exhibit B. Appellants' exhibits include a copy of page 228 from a similar light list, identified as "Excerpt from 1983 Light List" which likewise locates the buoy at Lat. 29–58–0N., and Long. 90–17.3W.

3. The record shows that the Corps was informed that the M/V CAPTAIN WILL may have struck the wrecks in 1972, that a hopper barge, VTC–110, did so in 1973, and that the M/V MARGIO had come aground over the wrecks in 1974. There is no evidence that the Corps notified mariners as to the hazard evidenced by these strikings. Nor did the Corps evidently consider these strikings as indications that the wrecks might present a hazard to navigation in the vicinity when it issued the permit in 1976 for the construction of a fleeting facility along the bank behind them.

accordance with customary procedure under which a tug captain, who is more familiar with his vessel, maneuvers it in close quarters. Having consulted the chart, Captain Bernier altered course slightly toward the river bank, in order to achieve greater distance from WR4, which he assumed marked the approximate location of the wrecks. WR4 was positioned some 650–700 feet from the bank. The SHERIDAN tow's course was well to its port of the buoy.

At a point some 100 feet downriver from WR4 and 410 feet from it, and according to record evidence approximately 700 feet from the tow's designated mooring position in the Fleet, the SHERIDAN barge suddenly rose three or four feet, sliding slightly to port. With the assistance of the Fleetboat, docking was then completed at the upriver end of the Fleet. Captain Bernier first assumed that the barge had hit a submerged slab of mud. Inspection disclosed that the SHERIDAN barge had sustained considerable damage, and later underwater investigation found fresh scraping marks on the Lykes wrecks at a point 13 feet below water level, 100 feet downriver from WR4, 410 feet toward the bank from it, and approximately 250 feet from the bank. It is not disputed in the record that the SHERIDAN barge had struck the wrecks. Appellants claimed $273,886 as damages for repairs to the barge and $235,000 for loss of revenues during its repair.

E. *District court's findings and conclusions.*

The district court based its conclusion that appellants were solely at fault on the following findings of fact and conclusions of law:

In 1976, the Corps issued a permit to Point Landing, Inc., to operate a barge fleeting facility starting at a point on the bank about 2900 feet upriver of the wrecks and proceeding upriver about 6300 feet.

The wrecks were charted on the U.S. National Ocean Survey Nautical Chart No. 11370 and were in the position shown on that Chart on September 29, 1983.

Buoy WR4, as a red buoy, had to be kept to starboard by vessels proceeding upriver, 14 U.S.C. [§] 87; 33 C.F.R. § 62.25–1(a) and (b), 33 C.F.R. § 62.25–5(b). Further, keeping such a buoy to starboard is not optional, in that its marking indicated "the pr[e]ferred side," 14 U.S.C. § 87; 33 C.F.R. § 62.25–5(c). Also, the buoy's quick flashing red light characteristic was of additional cautionary significance, 33 C.F.R. § 62.25–25(a).

Passing Buoy WR4 to port was a statutory violation, making applicable *THE PENNSYLVANIA* rule which placed the burden on appellants to show that this violation could not have caused the striking. Further, appellants could not show that passing on the wrong side of the wreck did not cause the striking. Since the wrecks were charted, the tow was presumed to have been at fault in striking them.

Buoy WR4 was on the station indicated on Chart No. [1]1370 and the Light List. The court, therefore, lacked jurisdiction to review the question of how and where a wreck should be marked because all of appellants' claims were barred by the discretionary function exception to the general waiver of sovereign immunity under the Suits in Admiralty Act.

## II.  ANALYSIS OF ISSUES ON APPEAL

Appellants contend that the district court made two clearly erroneous findings of fact, and misapplied the law in certain significant respects.

A. *Challenged Findings of fact*

1. *The location of the Fleet in relation to the wrecks.*

Appellants argue that the trial court clearly erred in finding that the LYKES wrecks were situated approximately 2900 feet downriver from the lower end of Flowers Fleet, rather than at a point directly offshore from the center of the Fleet. This factual question bears upon the appellants' basic contention that it was not possible for barge traffic to navigate in or out of the Fleet without passing into the "forbidden

area" behind buoy WR4 and also upon related questions of law. We read the court's findings · to say that in 1976 the Corps issued a permit to Point Landing, Inc., to operate a barge fleeting facility on the left descending bank starting at a point about 2900 feet upriver of the wrecks and proceeding upriver about 6300 feet; but we conclude that the court did not make a finding as to where Flowers Fleet actually was located in relation to the wrecks in 1983.

The court's findings as to the location of the fleeting area permitted by the Corps in 1976 evidently derive from the government's proposed findings of fact. In its proposed findings filed with the district court on May 19, 1986,[4] the government averred:

> 6. In 1976, the Corps of Engineers permitted Point Landing, Inc., to operate a barge fleeting facility on the Left Descending Bank of the Mississippi River, starting at a point about 2900 feet upriver of the wrecks, and proceeding upriver about 6300 feet.

But our careful review of the record shows that there is a complete absence of evidence to substantiate these purported facts. The 6300 feet figure apparently derives from the Corps' public notice dated December 15, 1975, which advised interested parties that it had received an application from Point Landing for a permit authorizing the establishment of a barge fleeting facility along the Mississippi River, LDB, "central to a point about 116 miles" AHP, and that 25 proposed anchor piles for the project were "to be located within an area about 6300 feet long, extending lengthwise approximately parallel to the mean low water shoreline." Notice of authorization and the actual Corps permit for a fleet, both dated September 27, 1976, describe the location of the proposed fleet simply as "central to a point about 116 miles above the Head of Passes." It is

undisputed that the wrecks and WR4 were positioned at 115.4 AHP. There is nothing in the record to indicate how the figure 2900 feet may have been derived, or what prompted the government to advise the district court that the Corps had issued a permit authorizing location of a fleet at a point beginning 2900 feet *upriver* of the wrecks.

In its brief before this Court, the government now explains the district court's finding by stating:

> A proper reading of this finding would place the wrecks "about in the center" of the fleeting facility. For example, simple math would place the wrecks 2900 feet upriver from the starting pointing of the fleet lea[v]ing the fleet extending an additional *3400* feet upriver ...

The government here reads the district court's findings (and its own previously submitted proposed findings of fact) to mean that the Fleet was located at a point beginning 2900 feet *down* river of the wrecks, and proceeding upriver some 3400 feet beyond them. The government now expressly concedes that the wrecks were "about in the center" of the fleeting facility.

This new reading accords with all record evidence as to where the Fleet was actually located at the time of the SHERIDAN casualty in 1983. Responding in April, 1985, to appellants' interrogatory, the government stated that the Flowers Company operated a fleeting facility in the area "from mile 115.2 to mile 115.7 ... during the period from 1980 to 1984."[5] Uncontradicted record testimony stated that the Fleet was located behind buoy WR4, which was positioned off either the middle or the lower portion of the fleeting area.

■ In view of these considerations, and because the location of the Fleet in relation to the wrecks at the time of the casualty is highly relevant to the determination of the

---

4. The Government's trial brief filed the same day also stated: "In 1976, the Corps of Engineers permitted a barge fleet to operate on the LDB [left descending bank], its nearest point being about half a mile upstream of the wrecks."

5. *See also* the government's reply to another set of appellants' interrogatories, from the same date, stating that the Corps had approved "a permit for fleeting at approximately mile 115 of the Mississippi River."

parties' liabilities, the district court, on remand, will need to make findings of fact on this question.

### 2. *The position of WR4 on September 29, 1983.*

■ The district court's finding as to the position of the buoy stated:

Buoy WR4 was on the station Chart No. [1]1370 and the Light List advertised to the mariner that he could expect to find it. That station was established by the Eighth Coast Guard District, in deciding to mark the wrecks.

Appellants urge that the court erred in finding that wreck buoy WR4 was still in the same position as that established by the Coast Guard when the Coast Guard decided to mark the wrecks in 1965. Appellants argue that the evidence shows instead that the buoy initially had been established much closer to the wrecks and was subsequently moved some distance channelward. This question is of consequence with respect to the applicability of both the discretionary function exception implied in the Suits in Admiralty Act and *THE PENNSYLVANIA* rule. The district court's finding states that at the time of the accident in 1983 the wreck buoy was on the same station as that established by the Coast Guard for the initial buoy in 1965. Such a finding is clearly erroneous. The record evidence shows, and it is undisputed, that the initial wreck buoy's station advertised to mariners was 60 feet channelward of the wrecks, but that at the time of the allision the buoy was positioned some 300 feet channelward from the wrecks and 410 feet from the point of allision. The district court's findings do not refer to these distances nor do they note or attempt to account for the discrepancies. On remand, the court must make specific factual findings on this question.

### B. *Challenged Conclusions of Law*

### 1. *Application of the discretionary function exception*

Appellants suggest that the district court erroneously applied the discretionary function exception to the Suits in Admiralty Act. If that exception were correctly applied and the court thereby deprived of jurisdiction, that determination would be dispositive. We conclude that on these facts the discretionary function exception does not apply.

We have recently dealt with the discretionary function exception in the Suits in Admiralty Act. *Wiggins v. United States,* 799 F.2d 962 (5th Cir.1986). We carefully noted the scope of this exception:

[T]he discretionary exception only reaches the discretionary decision as to whether to supply the service or not. But once the discretionary decision has been made to supply the service, then the very purpose of the ... Act was to waive sovereign immunity and allow recovery for negligent actions of the government beyond the discretionary decision.

*Id.,* at 966.

Clearly the government, through the Coast Guard, undertook to mark the LYKES wrecks by positioning a proper wreck buoy in close proximity to them in 1965, and to advise mariners as to the location of the wrecks by issuing proper notices to mariners at that time as to the position of the buoy and its exact distance from the wrecks. There is no question but that the buoy was located some 250 feet farther from the wrecks at the time of the allision in 1983 than when it was first stationed in 1965. Yet, there is no evidence at all in the record that the Coast Guard ever issued a further notice to mariners advising that the buoy had been repositioned.

■ It is not disputed that the point where the SHERIDAN barge struck the wrecks was 410 feet from the buoy. The government's discretion was exercised when it initially positioned the buoy 60 feet from the wrecks and issued notice to mariners accordingly. The government did not have discretion subsequently to move the buoy another 250 feet away from the wrecks the buoy was supposed to mark without issuing notice to mariners that this it had been done.

Since we conclude that these governmental acts and omissions were not within the discretionary function exception to the

Suits in Admiralty Act, the district court must consider whether the location of the buoy and wreck symbols shown on chart no. 11370 or the latitude and longitude designations shown on the 1983 Light List constitute sufficient notice to mariners as to the fact that wreck buoy WR4 had moved or been moved from 60 feet to some 300 feet channelward from the wrecks. These factual questions require precise findings. Chart no. 11370, as available to mariners in September, 1983, shows a visible wreck symbol adjacent to and slightly overlapping the symbol for WR4, but the chart shows no sunken wreck symbol in the vicinity.[6] The visible wreck symbol is irrelevant in view of the fact that the LYKES wrecks were totally submerged at the time of the allision, and apparently had been, according to record evidence, at least since 1974. Neither of the two versions of the 1983 Light List indicates the actual distance between the wrecks and WR4. Both place the buoy in exactly the same location described in the September 17, 1965 notice to mariners which stated that it was set 60 feet from the wrecks. The record contains no evidence that local mariners were aware that the LYKES wrecks were located farther towards the bank or that the wrecks posed any hazard to the navigation of barge traffic between WR4 and the Fleet.

The government concedes that it would be liable if the Coast Guard had negligently allowed the wreck buoy to be positioned off station. According to the record, the commanding officer from 1981 to 1985 on the Coast Guard Cutter WHITE HOLLY, which was the primary unit responsible for maintenance of WR4, testified that he was unaware that the buoy had originally been stationed 60 feet from the wrecks and stated that there had been no need for him to know where the wrecks were located in relation to the buoy.

The government would likewise be liable if it deliberately repositioned the buoy at such a distance from the wrecks as to mislead mariners as to their location. Coast Guard regulations state that wreck markers are to be placed "as near to the wreck as conditions will permit." 33 C.F.R. § 62.25–40. Assuming that the Coast Guard had discretion whether or not to mark a wreck, that discretion had to be exercised responsibly. *Lane v. United States*, 529 F.2d 175, 179 (4th Cir.1975). Once the Coast Guard voluntarily assumed the duty to mark, it also assumed the obligation to use due care in doing so. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955); *Central Rivers Towing, Inc. v. City of Beardstown*, 750 F.2d 565, 572 (7th Cir. 1984).

Evidence of reliance is necessary to establish that governmental negligence was a cause of the injury. *Central Rivers Towing*, 750 F.2d at 572. In order to gain a margin of safety, the SHERIDAN tug captain and pilot deliberately planned their approach to the Fleet so as to come close to the bank in order to avoid the marked location of the wrecks, trusting that the buoy had been placed properly in close proximity to the wrecks. Captain Belsome testified that if the buoy had been positioned 60 feet from the wrecks, he could have made a standard approach to the Fleet by passing channelward of the buoy,

---

**6.** At trial, the government introduced a copy of chart no. 11370 which, according to the cover letter from the U.S. Commerce Department dated July 17, 1985, had been "corrected to September 29, 1983." The "corrected" chart incorrectly still shows a *visible* wreck marker adjacent to and partially overlapping the buoy symbol, but adds a hand-drawn sunken wreck symbol slightly overlapping the buoy symbol and extending downriver from it a quarter of the way into the lower end of Fairview Crossing. Record testimony indicates that it is not possible to tell from the position of wrecks symbols (which are all of identical standard size) where an actual wreck may lie. Nevertheless, if the added sunken wreck symbol was meant to represent the LYKES wrecks, this "correction" could have further misled navigators into assuming that the wrecks are so close to WR4 as to lie partially in the channel. Record evidence, however, suggests that the added sunken wreck symbol may have been meant to designate the wreck of the M/V LITTLE HENRY, which sank near Flowers Fleet at 115.4 AHP early in 1983 and as of March 30, 1983, was located some 350 feet from the bank under approximately 57 feet of water. If so, the "corrected" chart still failed to designate the LYKES wrecks by a proper wreck symbol.

and thus would have cleared the wrecks. The SHERIDAN navigators clearly relied to their detriment on the government's undertaking to mark the location of the submerged wrecks properly. *Central Rivers Towing,* 750 F.2d at 573. The issue is not, as the United States suggests, whether the buoy served to warn of the wrecks' *existence*—that is, to convey the information that the area was unsafe, a circumstance about which pilots might otherwise be deceived. The issue instead is whether the buoy performed its function of *marking the location* of the wrecks. *Id.*

In holding that a wreck buoy which the Coast Guard set 525 feet from the wreck was negligently placed so far from it as to be misleading, the Fourth Circuit stated:

> [W]e think that, even if the decision to mark or remove the wreck be regarded as discretionary, there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made. There is certainly no discretion to mark a wreck in such a way as to constitute a trap for the ignorant or unwary rather than a warning of danger.

*Somerset Seafood Co. v. United States,* 193 F.2d 631, 635 (4th Cir.1951).[7] Responding to the government's contention that placing the buoy closer to the wreck would not be practicable due to added danger to Coast Guard tenders serving the buoy, the Court concluded:

> We do not hesitate to state that, under a close case, in the balancing of the two social interests here involved—the convenience of the Coast Guard in servicing the buoy and the safety of maritime navigation—we strongly favor the latter.

*Id.* at 637. In earlier decisions, the Fourth Circuit also found liability for negligence when buoys had been placed at distances of 350 feet and 150–200 feet, respectively, from the wrecks whose locations they were supposed to mark. *United States v. Travis,* 165 F.2d 546, 548 (4th Cir.1947); *The MARY A. BICKEL,* 46 F.2d 988, 989 (4th Cir.1931).

The fact that the government published charts showing the approximate location of the wrecks [8] cannot excuse its negligent or deliberate failure to station the buoy in close proximity to the wrecks. Such a failure would not be excused even if the SHERIDAN captain had not consulted the chart. "Although he did not consult the river chart, this would not have helped him avoid the pier since the chart only disclosed the pier's general location and [the tow pilot] already knew this." *Central Rivers Towing,* 750 F.2d at 573. *See also Lane,* 529 F.2d at 179–80.

Having undertaken to provide notice to mariners as to the distance between the wreck buoy and the LYKES wrecks, the government had a duty to notify mariners when it moved the buoy a substantial distance from the wrecks. Otherwise, foreseeably, reasonable prudent navigators would be misled into relying on the buoy to mark the wrecks' location. Such reliance, when docking at the Fleet, would lead them to set their course away from the buoy and closer to shore, thus increasing the danger that they would run over the wrecks. The record shows that Pilots Watts and Belsome and Captain Bernier were so misled. The government may have caused a hazard to navigation by creating the illusion of a broad fairway of access to the Fleet behind the buoy. That illusion would have been lessened, if not eliminated, had WR4 remained at its original station 60 feet chan-

---

**7.** *See also Eklof Marine Corp. v. United States,* 762 F.2d 200, 203 (2d Cir.1985): "The Coast Guard was under a duty to place the buoy in such a position that mariners who follow normal practice would not be enticed to enter upon a danger that otherwise might have been avoided."

**8.** It is doubtful that a mariner could reasonably be expected to have located the sunken wrecks from chart no. 11370. See *supra,* note 6. No sunken wreck symbol appears near the buoy symbol. The visible wreck symbol shown is located immediately behind the wreck buoy symbol, partly overlapping it. The commanding officer of the Coast Guard Cutter in charge of tending the buoy, a government witness, testified that the chart shows "the wrecks right there next to the buoy," and agreed that a mariner would navigate as to a wreck on the basis of the wreck buoy, as opposed to a large and somewhat imprecise symbol on a chart.

nelward of the wrecks, since the buoy then would have given clear warning that the wrecks were nearer the bank. The government thus may have created the danger by negligence after the critical discretionary decision had been made. The government's conduct therefore is outside the discretionary function exception implied in the Suits in Admiralty Act. *Wiggins v. United States,* 799 F.2d 962, 965–67 (5th Cir.1986).

We have previously found the government liable for failing to publish information about underwater hazards to navigation which it created. *Transorient Navigators Co., S.A. v. M/S SOUTHWIND,* 714 F.2d 1358 (5th Cir.1983). In the present case, the government appears to contend that the new location of WR4 was adequately indicated on chart no. 11370 and its preferred version of the 1983 Light List.[9] The government's assertion, in effect, is that mariners consulting these documents should have realized that the wreck buoy had been moved. They should have remembered that the buoy originally was stationed 60 feet from the wrecks, remembered where the wrecks were, and calculated that there were now some 300 feet between the buoy and the wrecks. We find such a contention of doubtful merit. One plying navigable waters should be able to rely on markings and need not rely on memory as to where or how a wreck is lying. *THE WISSAHICKON,* 226 F. 345, 347 (W.D.N.Y.1915); *Kaiser v. Traveler's Insurance Co.,* 359 F.Supp. 90, 94 (E.D.La. 1973), *aff'd* 487 F.2d 1300 (5th Cir.1974). On remand, the district court must determine whether the government met its obligation to give adequate notice to mariners as to the repositioning of WR4.

2. *Application of THE PENNSYLVANIA rule*

The district court held that appellants violated the statutory rule requiring vessels headed upriver to keep a red wreck buoy to starboard and that this violation triggered application of *THE PENNSYLVANIA* rule[10] which places on the statutory violator the burden of showing that the violation could not have caused the accident. The district court concluded that appellants were unable to meet this burden. Appellants contend that the court erred in applying *THE PENNSYLVANIA* rule because their conduct was within the special circumstances doctrine that exempts docking vessels from following customary rules of navigation, and because the government, by permitting the location of the Fleet behind the buoy, had waived any claim that WR4 served to prohibit barge traffic from entering the area behind it. Appellants suggest that actually *THE PENNSYLVANIA* rule should be applied against the government. Finally, appellants contend that even if *THE PENNSYLVANIA* rule applies against them, it concerns causation, not ultimate liability. Accordingly, appellants urge that the district court erred in not proceeding to determine the government's degree of fault and then allocate damages accordingly.

(a). *The special circumstances doctrine*

Case law has evolved the doctrine that vessels in special circumstances are not required to observe all the rules of navigation that would otherwise apply. Among these circumstances are situations where vessels are in the process of docking or departing from their slips.

The Supreme Court first enunciated the "special circumstances" doctrine in 1893. "The statutory steering and sailing rules ... have little application to a vessel backing out of a slip before taking her course, but the case is rather one of 'special circumstances' under rule or article 24, requiring each vessel to watch, and be guided by, the movements of the other." *THE SERVIA,* 149 U.S. 144, 13 S.Ct. 817, 822, 37

---

**9.** Both versions of the 1983 Light List position the buoy in exactly the same location as did the Sept. 17, 1965 notice to mariners which advertised that it was placed 60 feet channelward of the wrecks: Lat. 29–58–0N., Long. 90–17.3W. See *supra* note 1. It is difficult to conceive how the 1983 Light List can be read to provide notice that the buoy had been moved or was positioned more than 60 feet from the wrecks.

**10.** *THE PENNSYLVANIA,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874).

L.Ed. 681 (1893). We have stated that this doctrine extends to vessels in the process of docking.

A long established principle of admiralty law holds that where a vessel is entering or leaving a slip and has not yet begun to navigate on a steady course, the ordinary steering and sailing rules may not apply. *E.g.[,] The Transfer No. 18*, 74 F.2d 256, 257 (2d Cir.1934); *City of New York v. MORANIA No. 12, Inc.*, 357 F.Supp. 234, 240 (S.D.N.Y.1973). One authority has stated that special circumstances exist when "[v]essels ... [are] maneuvering into position alongside piers...." G. Gilmore & C. Black, *The Law of Admiralty* 7–11 at 509 (2d ed. 1975). Courts have applied the special circumstances rule where a vessel was navigating to her anchorage ground, e.g., *THE ISAAC T. MANN*, 63 F.Supp. 339, 341 (S.D.N.Y.1945).

*United Overseas Export Lines, Inc. v. Medluck Company Maviera, S.A.*, 785 F.2d 1320, 1324 (5th Cir.1986). *See also* cases cited in *Alamo Chemical Transportation Co. v. M/V OVERSEAS VALDES*, 398 F.Supp. 1094, 1103–04 (E.D.La.1975).

■ For this doctrine to apply, the docking vessel must have proceeded with due regard to all the dangers of navigation and collisions. *THE TRANSFER No. 18*, 74 F.2d at 257; *Alamo Chemical*, 398 F.Supp. at 1104. Record evidence in the present case indicates that the SHERIDAN tow was making a standard approach in accordance with prudent navigational safety considerations in view of the location of the Fleet and the river current. Appellants insist that it was impossible to dock at the Fleet without going into the area supposedly forbidden to river navigation by WR4. Even vessels that might technically honor the rule by passing the buoy to starbound before turning into the Fleet evidently would have had to enter the supposedly forbidden area.

The district court did not make a finding as to the location of the Fleet in relation to wreck buoy WR4, and we do not now say whether as a matter of law the SHERIDAN tow was within the special circumstances doctrine. It appears from the record that the tow might well have begun a reasonable, standard docking maneuver at the time of the accident, absent chargeable notice that the wrecks were as far from the buoy as proved to be the case. If so, appellants' conduct would likely have been within the special circumstances doctrine. If the court so determines, *THE PENNSYLVANIA* rule does not apply against appellants.

*(b). Waiver*

The district court, by finding a location of the fleeting facility unsupported by the record, takes no cognizance of the fact that appellants' tow was moving to dock at a fleeting facility established under a government permit yet located behind the wrecks and the wreck buoy. Various government witnesses regularly professed to have no concern for navigation outside the dredged channel and little or no knowledge as to the existence of the Fleet or of barge traffic proceeding in and out of the facility. But we cannot conclude from the record that the government was unaware of the existence and location of the Fleet or of the nature of traffic using it. The government, through the Corps, had issued a permit for its establishment as a *barge* fleeting facility. At trial, the government could only suggest that barge traffic might enter the Fleet by first passing WR4 to starboard, and then angling sharply against the downriver current toward the Fleet— an unsafe approach according to all the tug captains who testified on that point. If the Fleet was located directly behind WR4, it might have been possible for short tows destined for docking locations on the far upriver end of the Fleet to maneuver safely in such a fashion. But it would clearly have been impossible for tows heading for docking locations closer to the buoy to do so since it is undisputed that vessels approaching and docking at most of the Fleet area necessarily entered the Fleet behind WR4, i.e., portside, even if they first passed the buoy to starboard.

■ Further, the record indicates that the government knew or should have

known that barge traffic routinely passed behind the buoy in the course of docking and departing from the Fleet. It does not appear that the SHERIDAN tow violated rules of the road any more than did the regular and frequent barge traffic in and out of the Fleet. Both Coast Guard and Corps officials testified that they had determined that the LYKES wrecks posed no hazard to navigation to and from the Fleet. If in fact the Fleet was located directly behind the wrecks, the government cannot now be heard to assert that those who undertook such navigation committed a statutory violation such as to invoke the *THE PENNSYLVANIA* rule. Since the district court has not yet determined the factual question as to the location of the Fleet in relation to WR4 and the wrecks at the time of the allision, we do not at this time say as a matter of law that *THE PENNSYLVANIA* does not apply.

**(c). *THE PENNSYLVANIA* rule and the Coast Guard conduct**

Appellant suggests that *THE PENNSYLVANIA* rule places upon the government the burden of proving that the allision could not have occurred as a result of the Coast Guard's having moved WR4.

Coast Guard regulations call for placing wreck markers "as near to the wreck as conditions will permit." 33 C.F.R. 62.25–40. The Eastern District Court of Louisiana has previously held that failure to comply with this particular regulation constitutes a statutory violation that triggers application of *THE PENNSYLVANIA* rule. *Kaiser v. Traveler's Insurance Co.*, 359 F.Supp. 90, 94 (E.D.La.1973), *aff'd* 487 F.2d 1300 (5th Cir.1974). We have held that *THE PENNSYLVANIA* rule applies in allision cases where those responsible for properly marking stationary objects in navigable waters, including underwater obstructions, failed to do so. *Florida East Coast Railway Co. v. Revilo Corp.*, 637 F.2d 1060, 1066 (5th Cir.1981); *Gele v. Chevron Oil Co.*, 574 F.2d 243, 247–48 (5th Cir.1978). *See also Kaiser*, 359 F.Supp. at 94; *Gulf Oil Corp. v. Tug GULF EXPLORER*, 337 F.Supp. 709, 717 (E.D.La. 1971), *aff'd* 472 F.2d 1406 (5th Cir.1973).

We leave it to the district court on remand to decide whether on the totality of the facts, including those yet to be determined, *THE PENNSYLVANIA* rule applies against the government.

**(d). *The effect of* THE PENNSYLVANIA rule**

The rule of *THE PENNSYLVANIA* concerns only the burden of proof for showing causation; it does not determine ultimate liability for damages. *United Overseas Export*, 785 F.2d at 1325; *Otto Candies, Inc., v. M/V MADELINE D*, 721 F.2d 1034, 1036 (5th Cir.1983). When it has completed its factual findings, the district court may determine that *THE PENNSYLVANIA* rule applies against either appellants or appellees, or both. Such a determination, however, does not put an end to the inquiry as to fault and liability for damages. Whether the rule is applied against one or both parties to a collision or allision, both may be liable if their negligence proximately caused the accident, and damages are to be assessed in accordance with the principles of comparative negligence. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 1713, 1715–16, 44 L.Ed.2d 251 (1975); *Otto Candies*, 721 F.2d at 1036; *Allied Chemical Corp. v. Hess Tankship Co.*, 661 F.2d 1044, 1057–59 (5th Cir.1981); *Alamo Chemical*, 398 F.Supp. at 1104–07).

## III. CONCLUSION

Because we hold that the district court's findings of relevant facts are incomplete in critical respects and lacking in specificity, and because we hold as a matter of law that certain governmental acts and omissions were outside the discretionary function exception to the Suits in Admiralty Act, we VACATE the judgment before us and REMAND for further proceedings consistent with this opinion.

VACATED AND REMANDED.