**SHERIDAN TRANSPORTATION COMPANY and TUG NEW YORK COMPANY, Plaintiff–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant.**

**No. 89–3270.**

United States Court of Appeals, Fifth Circuit.

April 5, 1990.

---

3. *Id.* at 145.

796

David V. Hutchinson, Asst. Director, Admiralty—Torts Branch, Civil Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Scott R. Wheaton, Jr., Nathan P. Horner, Lugenbuhl, Burke, Wheaton, Peck & Rankin, New Orleans, La., for plaintiffs-appellees.

Before HIGGINBOTHAM, SMITH, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge.

### Facts and Proceedings Below

The barge SHERIDAN struck a submerged wreck in the Mississippi River on September 29, 1983. The owner of the barge, the Tug New York Company, and its charterer, the Sheridan Transportation Company, filed a complaint on July 18, 1984 against the United States under the Suits in Admiralty Act (SIAA), 46 U.S.C. App. § 741 et seq., for failure to properly mark the wrecks. The district court entered judgment for $478,429 in favor of the SHERIDAN together with interest from the date of the accident. The United States appeals. We modify and affirm.

The facts of this case were established, to a large extent, in the first appeal of this case—Sheridan Transportation Co. v. United States, 834 F.2d 467 (5th Cir.1987) —and are in part repeated here because the findings and conclusions we reached in Sheridan I play a large role in shaping the present appeal:

During Hurricane Betsy in 1965, the partially completed steamships GENEVIEVE LYKES and LETITIA LYKES were blown upriver from their moorings at Avondale Shipyards and sank in the Mississippi River at about Mile 115.4 above the Head of the Passes [AHP], approximately two miles south of New Orleans International Airport. The two sunken wrecks, extending some 540 feet in length, lie roughly parallel to the left descending bank of the river.... The wrecks have not changed location since coming to rest on the river bottom.

The U.S. Army Corps of Engineers ... maintains a dredged channel known as the Fairview Crossing, some 500 feet wide and 40 feet deep, farther into the river, some 300 feet beyond the wrecks. Shortly after the sinking of the wrecks, the Coast Guard established a lighted quick-flashing red wreck buoy 60 feet channelward of the wrecks, according to the Coast Guard's notice to mariners published September 21, 1965....

In 1976, the Corps granted Point Landing, Inc. a permit to operate a barge fleeting facility on the left descending bank of the river central to a point about 116 miles above the Head of the Passes.... A barge fleet, known as Flowers Fleet ..., was subsequently established along the bank behind the wrecks.... Apparently neither the Coast Guard nor the Corps considered the wrecks a hazard to navigation for traffic coming in and out of the Fleet.

National Ocean Service nautical chart 11370, 10th Edition, dated January 1, 1983, shows the Wreck buoy, WR4, just outside (to the north of) Fairview Crossing; immediately behind the buoy symbol there is a single, black visible wreck sym-

bol. There is no sunken wreck symbol in the immediate vicinity of the buoy symbol on the chart.... A notation on the chart specifically refers to 'Lighted Wreck Buoy WR4 at Mile 115.4' and advises: 'Consult the U.S. Coast Guard Light List and the Local Notice to Mariners for additional information.' The 1983 Light List describes WR4 as a 'Mississippi River Wreck Lighted Buoy,' and states that it is '[c]hannelward of last reported position of wrecks, left bank mile 115.4' at Lat. 29–58–ON. and Long. 90.17.3W, and that it '[m]arks wrecks of GENEVIEVE LYKES and LETITIA LYKES.' The Light List does not otherwise describe the location of the wrecks or indicate the distance between them and the buoy....

On September 29, 1983, Federal Pilot Russel Belsome was the helm of the ... SHERIDAN tug which was pushing the SHERIDAN barge upriver towards the Flowers Fleet. The oceangoing barge ... was then drawing 23'6" of water. The SHERIDAN tug was 100 feet long; the SHERIDAN barge was 350 feet long. Pilot Belsome ... discussed the approach to the Fleet with the SHERIDAN tug captain, Richard A.J. Bernier, and recommended to him a straight line or standard approach. As the tow approached the designated docking space at the Fleet, Pilot Belsome turned the controls over to Captain Bernier, in accordance with customary procedure under which a tug captain, who is more familiar with his vessel, maneuvers it in close quarters. Having consulted the chart, Captain Bernier altered course slightly toward the river bank, in order to achieve greater distance from WR4, which he assumed marked the approximate location of the wrecks. The WR4 was positioned some 650–700 feet from the bank.... The SHERIDAN tow's course was well to [the] port of the buoy.

At a point some 100 feet downriver from WR4 and 410 feet from it ..., the SHERIDAN barge suddenly rose three or four feet.... Inspection disclosed that the SHERIDAN barge had sustained considerable damage.... It is not disputed ... that the SHERIDAN barge had struck the wrecks.

*Sheridan I,* 834 F.2d 469–71.

In *Sheridan I* we remanded the case for further fact-finding. *Id.* at 469. The district court was directed to determine the position of the Flowers Fleet in relation to the LYKES wrecks; the position of the wreck buoy with respect to the LYKES wrecks; whether the government gave notice of the repositioning of WR4; and whether the PENNSYLVANIA rule should be applied to either the SHERIDAN or to the government. *Id.* at 473–74.

On remand the district court found that a buoy was established 60' channelward of the LYKES wrecks in 1965 and was moved 250' channelward in 1974. The buoy was moved not to better mark the wrecks but so that it would better mark the Fairview Crossing. The Coast Guard introduced into evidence for the first time a notice that the WR4 was relocated. Local Notice to Mariners No. 23 of June 5, 1974 gave the new position of the buoy. This position is also given by the 1983 Light List but neither the list or the 1974 notice indicate where the wrecks lie in relation to the buoy. Nor can the precise relationship between the buoy and the wreck be gleaned from chart no. 11370. The district court concluded, therefore, that the government failed to provide adequate notice that the wreck buoy was situated approximately 300 feet channelward of the wrecks.

The PENNSYLVANIA rule states that if a party violates a statute which is designed to preclude an accident from occurring, that party bears the burden of proof in showing that its fault did not contribute to the accident. Some time after the buoy was established to mark the LYKES wrecks, the Flowers fleet was established. The LYKES wrecks are located at Mile 115.4 AHP whereas the fleet facilities extend from Mile 115.2 to Mile 115.7 AHP. The wrecks, therefore, are approximately at the midpoint of the fleet. The district court concluded that this rule did not apply to the SHERIDAN because a barge could not approach the Flowers fleet without going in the forbidden zone on the port side

of the buoy. The court held that the government, on the other hand, ran afoul of this rule because the buoy was not placed " 'as near to the wrecks as conditions will permit.' " R. vol. 2 at 545 (quoting 33 C.F.R. § 62.25–40).

The government raises three issues on appeal. First, it argues that the buoy provided adequate notice of the position of the LYKES wrecks. Second, it argues that the PENNSYLVANIA rule should be applied to the SHERIDAN but not to the Coast Guard. Third, it contends that interest should run only from the date of judgment. In deciding this appeal we are mindful that the district court's factual findings may be set aside only if they are clearly erroneous whereas its legal conclusions are reviewed de novo. Fed.R.Civ.P. 52(a).[1]

### Notice

Before we may decide whether the district court was correct in concluding that the government failed to provide adequate notice of the position of the wreck buoy in relation to the LYKES wrecks, we must deal with the government's contention that its decision to move the WR4 300 feet channelward of the wrecks enjoys immunity from suit. In *Sheridan I* we held that the discretionary function exception did not immunize the government.[2] *Id.* at 473. This decision is, of course, the law of the case and may not now be disturbed absent a change in the law. *See Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir.1989)

**1.** Our review is hampered by the failure of the district court to "find the facts specially and state separately its conclusions thereon." Fed. R.Civ.P. 52(a). Although the district court's failure to carefully distinguish its findings of fact from its conclusions of law does not affect the standard of review, it renders our review more difficult.

**2.** The SIAA, unlike the Federal Tort Claims Act —28 U.S.C. 2680(a), does not expressly immunize the government for the exercise of a discretionary function. In *Wiggins v. United States*, 799 F.2d 962 (5th Cir.1986), however, we decided to read this exception into the SIAA.

**3.** Even before *Berkovitz* was decided, courts disagreed whether the decision to place a buoy in one position rather than another is clothed in sovereign immunity. *Compare Eklof Marine*

and *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.1967).

The appellant argues that *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) has worked a change in the law of the discretionary function exception and, therefore, our decision in *Sheridan I* should be re-examined. We do not need to decide today whether there is tension between *Sheridan I* and *Berkovitz*.[3] Even if the government had the discretion to move the buoys to a position where it no longer adequately marked the wrecks,[4] it could not do so without providing notice. *See Sheridan I*, 834 F.2d at 473. The discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 108 S.Ct. at 1959. We are aware of no consideration of public policy which is involved in a decision to place a wreck buoy in a position where it does not indicate the location of the wreck it purportedly marks without providing notice of this fact.

The aids to navigation do not exist in a vacuum and there are various documents which a mariner must use to determine whether he is justified in relying on an aid. *See e.g., SCNO Barge Lines v. Sun Transportation Co.*, 775 F.2d 221, 225–26 (8th Cir.1985). The government argued that there are three documents which supplied the requisite notice: chart no. 11370; the 1983 Light List; and the Local Notice to

*Corp. v. United States*, 762 F.2d 200 (2d Cir. 1985) *with Chute v. United States*, 610 F.2d 7 (1st Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980) and *Brown v. United States*, 790 F.2d 199 (1st Cir.1986), *cert. denied*, 479 U.S. 1058, 107 S.Ct. 938, 93 L.Ed.2d 989 (1987).

**4.** It cannot seriously be maintained that the WR4 gave adequate indication of the position of the wrecks. At trial the Coast Guard conceded that from this position, the buoy did not alert vessels navigating shore to shore of the location of the wrecks but only served to warn vessels traversing the Fairview Crossing of the wrecks. *See* testimony of Heym, chief of aids to navigation in the 8th Coast Guard District, Deposition at 11 and Willman, chief warrant officer of the Coast Guard vessel which tended to the WR4, R. vol. 4 at 34.

Mariners No. 23 of June 5, 1974. The district court concluded that these documents did not convey notice that the WR4 was no longer marking the LYKES wrecks insofar as vessels travelling bank to bank were concerned and this determination is not clearly erroneous.

The 1974 notice to mariners is a red herring. The local notice to mariners is designed to correct any errors in charts or light lists. The accident occurred in 1983 and the corrections made in the 1974 notice were incorporated in chart no. 11370 and the 1983 Light List.[5] Chart no. 11370 states "CAUTION. This chart has been corrected from ... the Local Notice to Mariners issued periodically by ... [the] Coast Guard." Charts are published "with the certain knowledge that they ... will be relied on as accurate portrayals of the waters covered." *DeBardeleben Marine Corp. v. United States*, 451 F.2d 140, 148 (5th Cir.1971). Although mariners are required to incorporate changes made by notices which correct charts and light lists, they should not be required to keep on hand and consult those notices which antedate the current chart and light list.

The chart and light list, which were current at the time of the accident, on the other hand, are relevant in determining whether notice of the fact that WR4 no longer served to mark the wrecks for traffic outside of the Fairview Crossing was given. Neither of these documents conveyed any idea of the position of the wreck buoy in relation to the wrecks. The 1983 Light List correctly displays the position of the WR4 but says nothing of the position of the wrecks. Chart no. 11370 contains a symbol which represents the buoy and one which represents the wrecks[6] but no mariner could ascertain from these symbols the relative position of the wrecks and the buoy. The government could have easily warned mariners by stating in the chart or in the light list that the buoy was 300 feet channelward from the wrecks or even by stating that the buoy only marked the wrecks for vessels traversing the Fairview Crossing and it was not to be relied on as marking the wrecks by vessels outside of the crossing.

■■ The government contends that in spite of the fact that neither the wreck buoy nor the chart nor the light list gave any indication of the position of the wrecks, it should not be held liable because the Flowers fleet was established after the WR4 was moved 300 feet channelward of the wrecks. The government's argument badly mischaracterizes the issue. It is completely irrelevant to the issue of liability whether the establishment of the Flowers fleet was foreseeable or not. The issue simply is whether an accident like that of the SHERIDAN was foreseeable or not. Even if no fleet had been established, there would have been traffic outside of the Fairview crossing and near the left descending bank. It was foreseeable when the buoy was moved in 1974, therefore, that it would mislead mariners in its new position.[7]

### The PENNSYLVANIA Rule

■ On remand the district court determined that the PENNSYLVANIA rule did not apply to the SHERIDAN but it did apply to the government. In *The Pennsylvania v. Troop*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874) the Court articulated a rule that when a party to a maritime accident is in violation of a statute designed to prevent that accident, the party violating that rule has the burden of proof in showing that its fault could not have been a cause of the accident. *See also Gele v. Chevron Oil Co.*, 574 F.2d 243 (5th Cir.

5. The 1974 Local Notice to Mariners gave the new position of the WR4 and this position is also found, unsurprisingly, in the 1983 Light List.

6. The wreck symbol is misleading because it is the one used for visible wrecks and the LYKES wrecks were not visible.

7. The government's argument, moreover, ignores the fact that the accident occurred in 1983 whereas the Flowers fleet was established in 1976. Even if we were to accept the Coast Guard's argument that the accident was unforeseeable until the Flowers fleet was established, the Coast Guard had seven years in which to rectify this dangerous situation.

1978) (the rule applies to allisions as well to collisions).

■ The government claims that the SHERIDAN was at fault for not passing a red buoy on its starboard side. In *Sheridan I* we stated, however, that if any vessel entering the Flowers fleet had to pass the buoy on its port side, then the doctrine of special circumstances would excuse the SHERIDAN from the rigors of the PENNSYLVANIA rule. 834 F.2d at 476–77. The district court determined that it was impossible to use the docking facilities of the Flowers fleet without passing into a forbidden zone behind the WR4 because the wrecks lay approximately in the middle of the fleet. This finding is not clearly erroneous and the SHERIDAN, therefore, does not run afoul of the PENNSYLVANIA rule.

■ The district court concluded that this rule should be applied against the government because it violated 33 C.F.R. § 62.25–40 which requires wreck buoys to be placed as near to the wreck as conditions permit. It is not necessary for us to determine this issue because the liability of the government is already established. Once the government decided to mark the wrecks, it had a duty to either properly mark the wrecks or to give notice that the WR4 did not mark the wrecks. It breached this duty. This breach in turn caused the accident. *See Sheridan I*, 834 F.2d at 475 ("The SHERIDAN navigators clearly relied to their detriment on the government's undertaking to mark the location of the wrecks properly.") The amount of damages is not in dispute. Nor is there any contributory negligence on the part of the SHERIDAN. By passing as far to the port of WR4 as possible, the captain of the SHERIDAN did what any prudent mariner would have done. He relied on the buoy which purported to mark the wrecks and the chart and the light list which did not notify him otherwise.

8. In its brief, the appellees state that suit was filed on July 24, 1984. The record shows, how-

*Interest*

The court below ordered the government to pay interest at 4% per annum from the date of the accident—September 29, 1983. The government contends that this suit is governed by the Public Vessels Act (PVA), 46 U.S.C.App. 781 *et seq.*, and § 782 of that act provides that no prejudgment interest may be awarded. The appellees argue that this suit falls under the SIAA, 46 U.S.C. App. § 741 *et seq.*, and that act authorizes prejudgment interest. The appellees concede, however, that the SIAA authorizes interest only from the date suit was brought and the judgment of the court below, therefore, should be modified so that interest runs from that date—July 18, 1984.[8]

■ There is no question that if this suit fell under PVA, it would be controlled by its provisions and not those of the SIAA. *See United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976). For a suit to fall under the PVA, the damage must be caused by a public vessel. *See* 46 U.S.C.App. § 781 and *Williams v. Central Gulf Lines*, 874 F.2d 1058, 1060–61 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 843, 107 L.Ed.2d 837 (1990). The government argues that a coast guard tender positioned the WR4 and the suit, therefore, is governed by the PVA. The coast guard tender, however, was not negligent. The buoy was placed in its correct position. When the "liability of the United States is based on its failure to disseminate ... notice ... [and not] negligence in the operation of ... Coast Guard vessels," the SIAA is the "appropriate basis of jurisdiction." *SCNO*, 775 F.2d at 227. The SIAA authorizes an award of prejudgment interest but only from the date that suit is filed. *Id.* and 46 U.S.C. App. § 745.

*Conclusion*

For the foregoing reasons, the judgment of the district court is MODIFIED so that

ever, that suit was filed on July 18.

interest at the rate of 4% per annum shall run from July 18, 1984 and as modified is

AFFIRMED.